[L.A. No. 32181. May 31, 1988.]

COMMITTEE OF SEVEN THOUSAND et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
CITY OF IRVINE et al., Real Parties in Interest.

494

COUNSEL

Frederic D. Woocher, Carlyle W. Hall, Jr., and Lisa Foster for Petitioners.

No appearance for Respondent.

Roger A. Grable, Heather A. Mahood, Rutan & Tucker, Alvin S. Kaufer, Robert D. Thornton, Peter C. Hoffman, Nossaman, Guthner, Knox & Elliot and James E. Erickson for Real Parties in Interest.

Adrian Kuyper, County Counsel (Orange), Gene Axelrod, Deputy County Counsel, Don V. Collin, Parker & Covert, Clayton H. Parker, Wendy H. Wiles, Rourke & Woodruff, Kennard R. Smart, Jr., Lois E. Jeffrey, Thomas F. Nixon, Paone, Genovese, Callahan, McHolm & Winton and Tim Paone as Amici Curiae on behalf of Real Parties in Interest.

OPINION

KAUFMAN, J.—We granted review in this case to consider whether Government Code section 66484.3 (all further statutory references are to this code unless otherwise stated), which permits city councils in Orange County to impose development fees to fund construction of major thoroughfares, renders invalid a proposed initiative measure which would prohibit Irvine's city council from imposing a new fee or tax to finance construction of any new transportation corridor, freeway, highway, or other road without first submitting the new fee or tax to a vote of the electorate. As we will explain, we have concluded that the initiative conflicts with section 66484.3. Because it addresses a matter of statewide concern, the statute prevails and the initiative is invalid. We will therefore affirm the judgment of the Court of Appeal.

## I. FACTS AND PROCEDURAL HISTORY

In the late 1970's three new "transportation corridors" were proposed for construction in Orange County. Designated the San Joaquin Hills, Eastern,

and Foothill corridors (hereafter the corridors), they would be high-speed, high-volume, controlled-access facilities, designed to meet minimum state and federal standards, and were planned for eventual incorporation into the state highway system. The cost of their construction has been estimated to be approximately $1 billion. As of 1985, however, no state or federal funds had been committed to these projects.

In April 1984, the Orange County Board of Supervisors requested the Orange County Transportation Commission to serve as a facilitator in efforts to have 11 Orange County cities join in a partnership to build the corridors.[1] The Orange County Transportation Commission explored two methods for raising the needed funds. The first method, which would have provided funds for other transportation improvements as well as the corridors, called for increasing the sales tax by 1 percent for a period of 15 years (see Pub. Util. Code, § 130400 et seq.). The proposed sales tax increase was placed before the voters, as required by state law, as Proposition A on the June 1984 ballot. The measure was defeated by a wide margin.

Proponents of the corridors then focused their attention on the other proposed funding plan—the imposition of fees on new development—which had been under study for at least two years. Section 66484, a provision of the Subdivision Map Act, authorizes cities and counties to impose fees as a condition of subdivision map approval or building permit issuance, with the fees to be used to defray the cost of constructing major thoroughfares and bridges to service the new development. In January 1984, legislation had been introduced (Assem. Bill No. 2431 (1983-1984 Reg. Sess.)) to clarify and amend section 66484 so it could be used to provide funding for the corridors. In particular, the legislation would have expressly permitted a city to impose a development fee for facilities shown on its general plan but located outside the city. The proposed amendments to section 66484 drew opposition and were replaced by a proposed new provision, section 66484.3, which would apply only to Orange County and cities located therein. The new provision was duly enacted as an urgency measure and became law. (Stats. 1984, ch. 708, § 1, p. 2619.)

Section 66484.3 authorizes both the County of Orange and the cities within the county to adopt major thoroughfare and bridge fee programs (hereafter MT&BF programs), and to enact ordinances imposing fees against new development in designated benefit areas in order to fund the construction of major highway projects in the county. (See also, § 50029.)

---

[1] The San Joaquin Hills corridor had been added to the transportation element of Orange County's general plan in 1976; the Foothill and Eastern corridors were added to the county's general plan in 1981. The corridors have also figured in the general plans of several cities, including the City of Irvine.

Section 66484.3 establishes a procedure for enacting such ordinances, requires deposit of the collected fees in a special fund dedicated to the purposes for which the ordinance was passed, and provides methods for borrowing or spending from the general fund in expectation of the proceeds of such fees. The development fee program is based on the general principle that future development will benefit from construction of major highways and should pay for them in proportion to projected usage attributable to the development.

On October 3, 1984, the Orange County Board of Supervisors adopted a MT&BF program and established areas of benefit for the corridors in the unincorporated areas of the county. The county began collecting fees under its program in November 1984. The county also drafted joint powers agreements, under which construction of the corridors is to be administered by two joint powers agencies—the Foothill/Eastern Transportation Corridor Agency and the San Joaquin Hills Transportation Corridor Agency—consisting of those entities which have instituted fee programs. (See § 6500 et seq.) Each joint powers agency shall be formed when at least five public entities have adopted the fee program and have approved the agreement creating the agency.

Under the joint powers agreements, all fees collected under the MT&BF programs for the corridors are to be remitted to the joint powers agencies. The MT&BF programs have been designed to raise approximately 48 percent of the total cost of constructing the corridors, with the balance to be sought from existing state and federal programs.

The City of Irvine is a charter city within the County of Orange and was reportedly the fastest growing city in the state at the time of the litigation below. Each of the three corridors would pass through or be adjacent to Irvine, which is therefore eligible for membership in both joint powers agencies. Assuming that all eligible entities joined the agencies, it has been estimated that Irvine would contribute approximately 25 percent of the fees collected for the corridors (or roughly 12 percent of the total cost).

In September 1984, Irvine's city council adopted several policy statements supporting imposition of development fees to finance construction of the corridors, and in February 1985 it conditionally approved Irvine's participation in the MT&BF program. The mayor executed two memoranda of understanding stating that the corridors were "regional in nature and must be planned, financed, and constructed as a cooperative effort by cities, the County of Orange, [and] the state and federal governments . . . ."

Committee of Seven Thousand,[2] an unincorporated nonprofit association of residents and electors of the City of Irvine, was organized in July 1984 for the purpose of qualifying as an initiative a measure entitled The Citizens' Right-to-Vote Ordinance (hereafter the initiative). The initiative, if adopted, would prohibit the city council, on and after January 1, 1985, from imposing or collecting, or joining any agency for the purpose of imposing or collecting, "any new fee or tax which would finance or aid in the financing of: the San Joaquin Hills Transportation Corridor (Freeway); the Foothill Transportation Corridor (Freeway); the Eastern Transportation Corridor (Freeway); or any new corridor, freeway, highway, or other road of any designation" except "by passage of a ballot measure approved by a majority of the qualified electors of the City voting on the measure at a regular or special election." Expressly excluded from the initiative's vote requirement are "proceedings for the construction of City owned streets the cost of which, or any portion of which, is to be borne by special assessments upon real property" and also fees relating to the Irvine Business Complex.

On June 24, 1985, the initiative petition was filed with Irvine's city clerk, who thereafter certified to the city council that the petition contained the verified signatures of 8,701 registered voters (19 percent of the total), thus qualifying for the ballot.[3]

On July 26, 1985, an action for writ of mandate was commenced to prohibit Irvine's city clerk and city council from placing the initiative on the ballot. (Munsell et al. v. City of Irvine (Super. Ct. Orange County, No. 46-47-20).) The petitioners in that action include two individuals who are residents and taxpayers of the City of Irvine. The other petitioners (all corporations with members who are companies and individuals paying taxes to and owning businesses in the City of Irvine) are the Building Industry Association of Southern California, Inc., Orange County Region; the Irvine Chamber of Commerce; the Industrial League of Orange County; and the Orange County Chamber of Commerce. These petitioners (hereafter collectively the initiative opponents or opponents) contend that the initiative is invalid and beyond the power of the electorate to enact because it would interfere with essential governmental functions by restricting the taxing and revenue-raising authority of the city, because it addresses a matter of statewide concern as to which the Legislature has delegated discretionary authority to the city council alone, because it attempts to be

---

[2] The organization's name apparently refers to the number of signatures needed to qualify an initiative petition for the ballot in the City of Irvine.

[3] Initiative procedures in the City of Irvine are governed by Elections Code sections 4001-4020. Under Elections Code section 4010, once the city clerk has certified to the city council that the initiative petition has been signed by at least 15 percent of the city's registered voters, the city council must either adopt the ordinance or submit it to the voters.

effective retroactively, and because it is "misleading and designed to confuse the electorate." In addition to the writ of mandate, injunctive and declaratory relief were requested.

In August 1985, the superior court granted the peremptory writ commanding Irvine's city council and city clerk to refuse to adopt the initiative, to refuse to submit it to the voters of the city, and to refrain from expending any public funds or otherwise acting to implement or to place the initiative on the ballot.

The present action was commenced in October 1985 by the filing of a petition for writ of mandate in the Court of Appeal[4] asking that court to (1) command the superior court to vacate its peremptory writ, and (2) command the city council either to adopt the ordinance or to place it on the ballot at a special election pursuant to Elections Code section 4010. In this action the petitioners (hereafter collectively COST) are Committee of Seven Thousand and three individuals who are taxpayers and registered voters of the City of Irvine, as well as being individual signatories and proponents of the initiative and the persons over whose names the notice of intent to circulate was published (Elec. Code, § 4002). Named as respondents were the Orange County Superior Court, the City of Irvine, the Irvine City Council, and the Irvine City Clerk.[5] The initiative opponents (petitioners in the superior court action) were named real parties in interest.

While the case was pending before the Court of Appeal, Irvine's city council gave first reading[6] to an ordinance adopting a MT&BF program for the purpose of financing the corridors. The city council also passed a resolution designating areas of benefit for the corridors and providing in essence that a fee be imposed as a condition of issuance of a building permit for construction within the areas of benefit, the fee to be used to defray the cost of constructing the corridors.

The Court of Appeal denied COST's application for a stay of any action by Irvine's city council to enact a fee assessment ordinance or to otherwise

---

[4] An appeal was taken from the superior court judgment granting the writ petition but no challenge is raised to the conclusion of the Court of Appeal that in this instance the remedy by appeal was inadequate and that the present writ proceeding was properly instituted.

[5] The Court of Appeal issued an alternative writ addressed solely to the superior court and in its subsequent opinion the City of Irvine, the city council, and the city clerk were designated real parties in interest rather than respondents.

[6] The procedure for enacting ordinances in Irvine is governed by section 407 of the Irvine City Charter. With a few exceptions, not here pertinent, the city council must follow a two-step process in which it first votes to introduce an ordinance (first reading) and then, at a second meeting at least five days later, it votes to adopt the ordinance (second reading and enactment).

enact any ordinance which might be encompassed by the initiative. Following denial of the stay application, the city council voted to adopt the development fee ordinance. COST responded by circulating a referendum petition. After the city clerk had certified the petition, but before the city council met to act on it, the initiative opponents commenced an action to invalidate the referendum (Munsell, et al. v. City Council of Irvine (Super. Ct. Orange County, 1986, No. 47-64-33)). The superior court issued a stay order, after which all parties agreed to hold further court proceedings in abeyance pending resolution of the present action. The City of Irvine is now collecting development fees but is holding them in a separate escrow account.

The Court of Appeal ultimately denied the petition for writ of mandate, thereby upholding the superior court's ruling. The Court of Appeal concluded that the ordinance proposed by the initiative is invalid because it conflicts with section 66484.3 which has specifically entrusted a discretionary power over a matter of statewide concern to the board of supervisors and the city councils.

Briefs on the merits have been filed in this court by COST and by the initiative opponents. Amicus curiae briefs in support of the position of the opponents have been filed by the County of Orange, the Orange County Transportation Commission, the California Building Industry Association, the Foothill/Eastern Transportation Corridor Agency, the San Joaquin Hills Transportation Corridor Agency, and two members of Irvine's city council. The other three members of Irvine's city council have filed a brief in support of COST.

## II. THE INITIATIVE CONFLICTS WITH SECTION 66484.3

 The Court of Appeal held that the initiative is invalid because it conflicts with state law on a matter of statewide concern. COST concedes the validity of the principle—i.e., "legislation in an area of statewide concern preempts conflicting regulation by a charter city" (*The Pines* v. *City of Santa Monica* (1981) 29 Cal.3d 656, 659 [175 Cal.Rptr. 336, 630 P.2d 521])—but maintains it has no application here because the initiative neither conflicts with state law nor touches on a matter of statewide concern.

### A. *The Statutory Language.*

 Section 66484.3 conflicts with the initiative if, as the Court of Appeal concluded, it confers authority to enact MT&BF programs exclusively on the Orange County Board of Supervisors and the city councils of

the various cities within Orange County. The first point to be determined, therefore, is whether this construction of the statute is accurate.

■ Our primary aim in construing any law is to determine the legislative intent. (*Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 187 [185 Cal.Rptr. 260, 649 P.2d 902].) In doing so we look first to the words of the statute, giving them their usual and ordinary meaning. (*Young* v. *Haines* (1986) 41 Cal.3d 883, 897 [226 Cal.Rptr. 547, 718 P.2d 909]; *People* ex rel *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 43 [127 Cal.Rptr. 122, 544 P.2d 1322].)

■ As originally enacted,[7] section 66484.3 stated that "[t]he *board of supervisors* of the County of Orange and the *city council* of any city in that county may, by ordinance, require the payment of a fee . . . for purposes of defraying the actual or estimated cost of . . . constructing major thoroughfares." (Italics added.) The Court of Appeal held that this provision constituted a *specific delegation* of authority to city councils in Orange County and that the initiative would conflict with this provision by reposing authority to enact such ordinances in Irvine's electorate rather than its city council.

■ Over the years this court has struggled with the question whether a statutory reference to action by a local legislative body indicates a legislative intent to preclude action on the same subject by the electorate. A review of these decisions supports the conclusion that while such references are generally not conclusive as to legislative intent, they do support an inference that the intent was to preclude action by initiative or referendum. Review of the case law further suggests that the strength of the inference varies according to the precise language used in the statute, a reference using generic language such as "governing body" or "legislative body" supporting a weaker inference than a specific reference to boards of supervisors and city councils. A third conclusion to be drawn is that an intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair.

Our review of the decisions of this court begins with *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947], in which we held invalid a proposed initiative which would have required a city council to call an election to determine whether a charter city should withdraw from a regional water district. Under the Metropolitan Water District Act (Stats. 1927, ch. 429, p. 694), the decision to join or withdraw from a water district was conferred

---

[7]Section 66484.3 has subsequently been amended but the amendments do not affect the issues considered in this case.

on the voters but proceedings to withdraw were to be initiated by the "governing body" of the municipality. After concluding that district procedures were not municipal affairs, we stated that the reference to the "governing body" could not "be properly construed to mean other than that the legislature . . . has designated the 'governing body' of the municipality as the agency for submitting the proposition to withdraw, and has prescribed the formalities it has deemed necessary to effectuate the withdrawal." (*Riedman, supra,* 217 Cal. at p. 387.) Thus in *Riedman* the statutory reference to the "governing body" and the regional scope of the statute combined to persuade this court that action by initiative was barred.

In *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225], we construed legislation placing on the "board of supervisors" the duty of providing suitable quarters for the municipal and superior courts. We concluded that this legislation conflicted with and rendered invalid a proposed initiative that would have repealed a resolution designating a site for court buildings.

In *Blotter* v. *Farrell* (1954) 42 Cal.2d 804 [270 P.2d 481], a city council refused to act on an initiative calling for a special election to change councilmanic district boundaries. At the time, section 35322 provided that after annexation of territory to a city divided into wards, "the legislative body, by ordinance, shall alter the boundaries of the city wards to include the annexed territory . . . ." We noted that under this provision the power to redistrict was "given directly to the city council and indirectly to the electors under their initiative powers granted by the Constitution of California." (*Blotter, supra,* at pp. 811-812 )[8]

Three years later, in *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832 [313 P.2d 545], we considered the language of Revenue and Taxation Code section 7201, providing: "Any county may by action of its board of supervisors adopt a sales and use tax in accordance with the provisions of this part." Concluding that referendum was not available to challenge an ordinance enacted under this provision, we relied in part on the statutory wording: "Ordinarily, a county exercises its powers through its board of supervisors [citation], and it would have been unnecessary to refer to the 'board of supervisors,' in addition to the 'county,' if the intent had been to treat sales tax ordinances as ordinary legislation subject to referendum. The

---

[8] Under the legislative scheme examined in *Blotter,* an ordinance to create a district system for city council elections was required to be submitted to the voters. (§ 34871.) While section 35322 provided specifically for redistricting following annexation, there was no express provision for redistricting following population shifts. *Blotter* concluded, first, that the power to enact a district system included by necessary implication a power to amend or repeal the enacting legislation and, second, that such legislation could be proposed by initiative petition. (See now, § 34873.)

fact that the statute not only provides that a county can adopt such a tax, but in addition specifies that this is to be done by action of the board of supervisors, plainly shows that the Legislature intended to limit to boards of supervisors the power to enact such ordinances. (See *Barlotti* v. *Lyons,* 182 Cal. 575, 577-584 [189 P. 282]; but cf. *Blotter* v. *Farrell,* 42 Cal.2d 804, 811-812 [270 P.2d 481].)" (*Geiger, supra,* at p. 838.)

*Blotter* and *Geiger* are not irreconcilable. In *Blotter* the statute at issue dealt with alteration of councilmanic district boundaries, a municipal affair, and the statute used only a generic reference to the "legislative body." Moreover, the legislative scheme *required* a vote of the electorate to *establish* a district system, thus reflecting a legislative determination that direct voter participation in such matters was appropriate. In *Geiger,* on the other hand, the Legislature had used the more specific reference to the "board of supervisors." While the statute at issue in *Geiger* also dealt with a purely local matter, the inference that the Legislature intended to exclude voter participation was supported by the provisions of our state Constitution (former art. IV, § 1; see now, art. II, § 9) barring the referendum on "tax levies or appropriations for the usual current expenses of the State." (See *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623-624 [191 P.2d 426].) These differences in statutory language and subject matter help to explain the results reached in the respective cases.

Most recently, in *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810 [226 Cal.Rptr. 81, 718 P.2d 68], we interpreted the provisions of Evidence Code section 669.5 shifting the burden of proof in actions challenging the validity of growth control ordinances. Subdivision (a) of the section states that it applies to ordinances "enacted by the governing body of a city" whereas subdivision (d) expressly exempts "a voter approved ordinance adopted by referendum or initiative" before the section's effective date and containing certain provisions.

Concluding that Evidence Code section 669.5 applied to ordinances enacted by initiative after the effective date of that section, we noted that one of the versions considered by the Legislature before the section's enactment referred to an ordinance "enacted by the governing body . . . except . . . an initiative measure . . . ." As we observed, "the wording of this version indicates that the Legislature must have assumed that measures enacted by a 'governing body' *included* initiatives adopted by the electorate, since initiatives were exempted from the reach of the statute within the same sentence." (*Building Industry Assn., supra,* 41 Cal.3d at pp. 819-820, original italics; see also, *Lee* v. *City of Monterey Park* (1985) 173 Cal.App.3d 798, 806-807 [219 Cal.Rptr. 309].) This specific and persuasive evidence of legislative intent was sufficient to rebut the weak inference,

arising from use of the generic term "governing body," that growth control measures enacted by initiative were not included.

We have also reviewed Court of Appeal decisions but have found none in which statutory use of specific references to a "city council" or "board of supervisors" was considered. When construing statutes containing generic references, such as "legislative body" or "governing body," the Courts of Appeal have generally permitted exercise of the initiative and referendum when the subject matter was of purely local concern (e.g., *Atlas Hotels, Inc.* v. *Acker* (1964) 230 Cal.App.2d 658 [41 Cal.Rptr. 231] [levy of a transient room tax]; *Reagan* v. *City of Sausalito* (1962) 210 Cal.App.2d 618 [26 Cal.Rptr. 775] [acquisition and improvement of land for use as playgrounds and parks]; *Osborn* v. *Board of Supervisors* (1915) 27 Cal.App. 85 [148 P. 970] [division of county into townships for purposes of electing justices of the peace]) but not when the statute dealt with a matter of statewide concern (e.g., *Walker* v. *City of Salinas* (1976) 56 Cal.App.3d 711 [128 Cal.Rptr. 832] [Community Redevelopment Law]; *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558 [11 Cal.Rptr. 340] [traffic regulation]). Significantly, however, no Court of Appeal decision has been found upholding an initiative or referendum seeking to exercise or annul exercise of a delegated power relating to a matter of statewide concern where the delegating statute contained even a generic reference.

As COST observes, many powers conferred by statute on the "legislative body" of a local entity have been held to be subject to initiative and referendum. For example, ballot measures may be used to enact or amend zoning ordinances despite the language of sections 65850-65858 conferring zoning powers on the "legislative body." (*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565] [zoning initiative in general law city]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038] [same]; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973] [zoning initiative in charter city]; *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826 [323 P.2d 71] [zoning referendum in general law city].) Similarly, adoption and amendment of a general plan may be the subject of initiative or referendum although section 65356 gives these powers to the "legislative body." (*Yost* v. *Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152] [referendum on general plan amendment]; *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283] [referendum in general law city on resolution adopting general plan]; 66 Ops.Cal.Atty.Gen. 258 [initiative to amend general plan of general law county].) However, in all these cases the statutes dealt with purely local concerns and, as we have noted,

the term "legislative body" is more easily read as including the electorate than the terms "city council" or "board of supervisors."

■ Our review of the relevant case law leads us to conclude that the Legislature's use of the terms "board of supervisors" and "city council" in section 66484.3 gives rise to a strong inference that the Legislature intended to preclude exercise of the statutory authority by the electorate.

B. *Municipal Affairs and Statewide Concerns.*

■ Because, as we have seen, this is an important factor in ascertaining legislative intent, we consider next whether section 66484.3 deals with matters of statewide concern rather than strictly municipal affairs. As used in this discussion, "statewide" refers to all matters of more than local concern and thus includes matters the impact of which is primarily regional rather than truly statewide.

■ A charter city such as Irvine is authorized by the state Constitution to "make and enforce all ordinances and regulations in respect to municipal affairs." (Cal. Const., art. XI, § 5, subd. (a).) Under this provision, ordinances enacted in a charter city relating to matters which are purely municipal affairs prevail over state laws covering the same subject. (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].) "As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters . . . ." (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61 [81 Cal.Rptr. 465, 460 P.2d 137].)

We have recognized that no exact definition of the term "municipal affairs" can be formulated, and that what constitutes a municipal affair or matter of statewide concern may change over time in response to changing conditions in society. (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 62-63.) In general, "municipal action which affects persons outside of the municipality becomes to that extent a matter which the state is empowered to prohibit or regulate . . . ." (*Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 879 [164 Cal.Rptr. 510, 610 P.2d 407]. See also, *Baggett* v. *Gates, supra,* 32 Cal.3d 128, 139-140; *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 321 [118 Cal.Rptr. 315].)

■ The statewide importance of section 66484.3 becomes apparent upon examination of its relation to highway construction and the development of regional transportation systems. While street work has long been regarded as a matter of local concern (see *City of Walnut Creek* v. *Silveira* (1957) 47 Cal.2d 804, 812 [306 P.2d 453]; *Raisch* v. *Myers* (1946) 27 Cal.2d

773, 778 [167 P.2d 198]) it has also been recognized that construction of major highways has effects beyond municipal boundaries (see *People* ex rel *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 498, fn. 20 [96 Cal.Rptr. 553, 487 P.2d 1193]; *Southern California Roads Co.* v. *McGuire* (1934) 2 Cal.2d 115, 123 [39 P.2d 412]; *Young* v. *Superior Court* (1932) 216 Cal. 512, 516-517 [15 P.2d 163]; cf. *Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d 848, 879 [receipt of federal highway funds a matter of statewide concern]). Indeed, Streets and Highways Code section 250 provides: "It is hereby declared to be essential to the future development of the State of California to establish and construct a statewide system of freeways and expressways and connections thereto without regard to present jurisdiction over the highways, roads, and streets that might be included . . . ." (See also, Sts. & Hy. Code, § 300.)

Section 66484.3 was designed specifically for the funding of "major thoroughfares whose primary purpose is to carry through traffic and provide a network connecting to or which is part of the state highway system . . . ." (§ 66484.3, subd. (b)(1).) In other words, the contemplated transportation facilities are to be used primarily for travel between cities rather than within cities. This intent is shown further by the provision authorizing use of the fees collected to construct facilities shown on the city's general plan "whether the facilities are situated within or outside the boundaries of the city . . . ." (§ 66484.3, subd. (i).) The construction of roads located outside a city's boundaries cannot be a strictly municipal affair.

While the statute does not itself establish a regional mechanism for planning and constructing major highways, such as the formation of joint powers agencies, the use of such mechanisms is necessarily implied from the nature of the facilities themselves, since it would be practically impossible for any one or more cities acting independently to plan and build efficient additions to a regional highway system. (See *City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 247 [90 Cal.Rptr. 8, 474 P.2d 976].) In short, the projects contemplated by section 66484.3 are of the kind likely to require coordination on a regional basis and to have substantial impacts on persons living outside the boundaries of the city and so are matters of statewide concern. ■ (See *Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603, 611 [9 Cal.Rptr. 431] [". . . when a general law of the state, adopted by the state Legislature, provides for a scheme of public improvement, the scope of which intrudes upon or transcends the boundary of one or several municipalities, together with unincorporated territory, such contemplated improvement ceases to be a municipal affair and comes within the proper domain and regulation of the general laws of the state."].)

■ COST argues that construction of the corridors cannot truly be a matter of statewide concern because the Legislature has not *required* but

has merely *enabled* the local entities to impose development fees for construction of the corridors if the entities choose to do so. However, in seeking to achieve objectives of statewide concern the Legislature is not limited to means which are mandatory or coercive but can also employ means reasonably calculated to facilitate or encourage appropriate action by local entities, and the problem addressed by a statute does not cease to be of statewide concern simply because the Legislature has authorized participation on a voluntary basis. (See *Southern California Roads Co.* v. *McGuire, supra,* 2 Cal.2d at p. 123.) Here the legislation in question was passed at the urging of local government officials to provide an innovative solution to a regional transportation problem. The Legislature correctly anticipated that many entities would voluntarily elect to use the revenue source provided by the legislation and could reasonably anticipate that permissive legislation would be most likely to engender the spirit of cooperation essential for this regional enterprise.

We conclude that section 66484.3 deals with matters of statewide concern rather than strictly municipal affairs.

## C. *Other Indicia of Legislative Intent.*

The construction of the statute as a delegation of authority to city councils is supported not only by the language of section 66484.3, which refers specifically to city council action, but also by a comparison with section 66484, the provision on which section 66484.3 was modeled. The parallel language of section 66484 reads: "A local ordinance may require the payment of a fee . . . for purposes of defraying the actual or estimated cost of . . . constructing major thoroughfares." Under the principle of statutory construction that a material change in the language of a legislative enactment is ordinarily viewed as showing an intent on the part of the Legislature to change the meaning of the statute (*Twin Lock, Inc.* v. *Superior Court* (1959) 52 Cal.2d 754, 761 [344 P.2d 788]), the insertion of a specific reference to city councils in section 66484.3, not found in section 66484, is evidence of intent to confer authority specifically and exclusively on the city council. ▆ (See also, *City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318] [" 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' "].)

COST argues that the available legislative history rebuts the inference that the Legislature attached significance to the specific references to the board of supervisors and the city councils. These references were not present when the legislation was first introduced in the form of an amendment

to section 66484. They were inserted in the fifth and final Assembly amendment of the bill when it was decided to propose a new statute limited in effect to Orange County, rather than an amendment of section 66484.[9] The geographical limitation was duly noted in reports prepared by the Assembly Local Government Committee and by the Senate Housing and Urban Affairs Committees, but no mention was made of the references to the board of supervisors and city councils. The reports listed eight ways in which section 66484.3 would change existing law but did not mention that the new legislation would have the effect of excluding action by the electorate or delegating authority specifically or exclusively to local legislative bodies.[10] The Legislative Council's Digest of the bill, while noting the geographical limitation, similarly omits any mention of this aspect of the new enactment.

■　　While legislative committee reports are legitimate and valuable aids in determining legislative intent (*Curtis* v. *County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1250 [218 Cal.Rptr. 772]), they are certainly not conclusive (see *San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 863 [191 Cal.Rptr. 800, 663 P.2d 523]), and omissions in such reports are inherently less reliable indicia of intent than positive statements. Here the weak inference which might possibly be drawn from the omission in the committee reports is insufficient to overcome the other factors previously discussed.

---

[9] COST's argument that the references to the board of supervisors and city councils were merely a convenient method of stating the provision's geographical limitations is unpersuasive because these references could be deleted and the geographical limitation would still be clear without any additional language—i.e., "T̶h̶e̶ ̶b̶o̶a̶r̶d̶ ̶o̶f̶ ̶s̶u̶p̶e̶r̶v̶i̶s̶o̶r̶s̶ ̶o̶f̶ the County of Orange and t̶h̶e̶ ̶c̶i̶t̶y̶ ̶c̶o̶u̶n̶c̶i̶l̶ ̶o̶f̶ any city in that county may, by ordinance, require . . . ."

[10] The Senate report lists the following changes: "1. Expands the authorized uses of fees collected to include paying for a network which is *part of* the state highway system and *widening* existing major thoroughfares. [¶] 2. Provides that bridges which are an integral part of a major thoroughfare for which fees are proposed, need not be shown specifically on the general plan. [¶] 3. Allows the project costs and method of fee apportionment to be modified to reflect cost estimates or actual costs and changes in apportionment due to changes in land use or other factors. Fees may be periodically adjusted automatically to reflect the Consumer Price Index or some other indicator not under the governing body's control. [¶] 4) Allows a single fund, into which fees are deposited, to be created for all of the bridge or thoroughfare projects in a single area of benefit. [¶] 5) Allows a city to establish a fee program for facilities shown on its or the county's general plan, whether or not the facilities are within the city limits. The property assessed must be in an area of benefit within the city's boundaries. [¶] 6) Allows a county to spend fee money for facilities or portions of facilities located within cities. [¶] 7) Allows affected property owners' written majority protest of the fee program to be overruled by a four-fifths vote of the legislative body. [¶] 8. Prohibits the contesting of the fee unless the action or proceeding is commenced within 60 days after recordation of the fee resolution. This limitation also applies to fee modifications." (Sen. Housing and Urban Affairs Com., Rep. on Assem. Bill No. 2431 (1983-1984 Reg. Sess.) June 14, 1984. Emphasis in original.)

The Assembly report lists the same eight changes in slightly different form. (Assem. Local Gov. Com., Rep. on Assem. Bill No. 2431 (as amended Apr. 11, 1984) May 9, 1984.)

As COST notes, the Legislature has in one instance used language which makes the intention to exclude action by the electorate unmistakably clear. Section 53541 provides that "[a]ny provision of law requiring an election to the contrary notwithstanding, the legislative body without a vote of the electors may issue bonds of the local agency . . . ." (See *City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239.) This situation is distinguishable, however, because the city would otherwise have been *required* to obtain voter approval of the revenue bonds in issue. (*Id.* at p. 248.) No similar preexisting requirement of voter approval applies to enactment of MT&BF programs.

Finally, COST argues that we should not infer a legislative intent to exclude action by the electorate because the Legislature could have no legitimate reason for imposing this restriction. As stated, the purpose of the legislation was to facilitate action at the local level to deal with an urgent regional transportation problem. Permitting operation of the initiative and referendum powers would make enactment of the contemplated local legislation more difficult and time-consuming. (See *Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d at p. 629 [recognizing "the uncertainty and delay of referendum proceedings."].) Also, the county supervisors and city council members deal constantly with planning matters and regional concerns and thus should more readily and thoroughly understand the underlying issues. Being themselves elected officials, county supervisors and city council members can be expected to make decisions reflecting both their own acquired expertise and the sentiments of their constituents.

 Having reviewed the language, subject matter, and history of the statute, and other pertinent matters suggested by the parties, we conclude that in enacting section 66484.3 the Legislature intended to delegate authority to enact ordinances establishing MT&BF programs exclusively to the Orange County Board of Supervisors and the city councils of cities within Orange County. By requiring voter approval to enact such ordinances, the initiative conflicts with section 66484.3.

III. SECTION 66484.3 DOES NOT VIOLATE THE HOME RULE OR INITIATIVE PROVISIONS OF THE STATE CONSTITUTION

 COST contends that section 66484.3, if interpreted to preclude local action by initiative and referendum, will violate the provisions of our state Constitution guaranteeing home rule to charter cities (art. XI, § 5) and reserving to local electorates the powers of initiative and referendum (art. II, § 11).

As already noted, the home rule powers of charter cities extend only to municipal affairs and we have concluded that section 66484.3 relates to

matters of statewide concern. COST argues, nonetheless, that this view of the question is flawed because the initiative itself relates only to the method by which ordinances are to be enacted, or the allocation of authority as between the local voters and their representatives, which COST contends is purely a municipal affair (see, e.g., *Bayless* v. *Limber* (1972) 26 Cal.App.3d 463, 469 [102 Cal.Rptr. 647]) and thus exempt from state regulation.

Implicit in this argument is the assertion that state legislation on matters of statewide concern may prevail over local enactments only to the extent the state law does not invade the sphere of municipal affairs. We have repeatedly rejected this proposition: "If a state statute affects a municipal affair only incidentally in the accomplishment of a proper objective of state-wide concern, then the state law applies to charter cities." (*Wilson* v. *Walters* (1941) 19 Cal.2d 111, 119 [119 P.2d 340]; accord, *Baggett* v. *Gates, supra,* 32 Cal.3d 128, 139; *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 292 [32 Cal.Rptr. 830, 384 P.2d 158]; *Polk* v. *City of Los Angeles* (1945) 26 Cal.2d 519, 541 [159 P.2d 931]; *Dept. of Water & Power* v. *Inyo Chem. Co.* (1940) 16 Cal.2d 744, 754 [108 P.2d 410].) Section 66484.3 is controlling even though it incidentally affects the method of enacting one particular kind of ordinance in charter cities.

 Next COST contends that section 66484.3, to the extent it precludes exercise of the initiative and referendum, conflicts with article II, section 11 of the state Constitution providing that "Initiative and referendum powers may be exercised by the electors of each city or county . . . ." COST maintains that "the precise issue" it raises here was decided in its favor in *Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].

In *Associated Home Builders* we held that the notice and hearing provisions prescribed by state law for enactment of municipal zoning and land use ordinances in general law cities "govern only ordinances enacted by city council action and do not limit the power of municipal electors, reserved to them by the state Constitution, to enact legislation by initiative." (*Associated Home Builders, supra,* 18 Cal.3d at p. 588.) This holding flowed directly from our conclusion that "the Legislature never intended the notice and hearing requirements of the zoning law to apply to the enactment of zoning initiatives." (*Id.* at p. 594.)

COST relies primarily on the following language: "The 1911 constitutional amendment, in reserving the right of initiative on behalf of municipal voters, stated that 'This section is self-executing, but legislation may be enacted to facilitate its operation, *but in no way limiting or restricting* either the provisions of this section or *the powers herein reserved.*' (Former Cal.

Const., art IV, § 1.) (Italics added.) Although the Legislature can specify the manner in which general law cities enact ordinances restricting land use, legislation which permits council action but effectively bars initiative action may run afoul of the 1911 amendment. (See Comment, *op. cit., supra,* 64 Cal.L.Rev. 74, 102.) Thus the notice and hearing provisions of the state zoning law, if interpreted to bar initiative land use ordinances, would be of doubtful constitutionality . . . ." (*Associated Home Builders, supra,* 18 Cal.3d at p. 595, fns. omitted; see also, *Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at p. 821; *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 674-675 [194 Cal.Rptr. 781, 669 P.2d 17].)

The subject matter at issue in *Associated Home Builders*—municipal zoning and land use regulations—was a municipal affair and our comments in that case must be read in that context. In matters of statewide concern, the state may if it chooses preempt the entire field to the exclusion of all local control. If the state chooses instead to grant some measure of local control and autonomy, it has authority to impose procedural restrictions on the exercise of the power granted, including the authority to bar the exercise of the initiative and referendum. (See *Riedman* v. *Brison, supra,* 217 Cal. 383, 387; *Ferrini* v. *City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 246-248 [197 Cal.Rptr. 694]; *Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 562.)

In explaining why the Legislature may bar local initiatives in matters of statewide concern, courts have sometimes resorted to an awkward and confusing characterization of the delegated power as "administrative." Thus it has been said that when a local legislative body acts pursuant to a power delegated to it by state law, "the action receives an 'administrative' characterization, hence is outside the scope of the initiative and referendum." (*Hughes* v. *City of Lincoln* (1965) 232 Cal.App.2d 741, 745 [43 Cal.Rptr. 306]; see also, *Merriman* v. *Board of Supervisors* (1983) 138 Cal.App.3d 889, 892 [188 Cal.Rptr. 343]; *Friends of Mount Diablo* v. *County of Contra Costa* (1977) 72 Cal.App.3d 1006, 1011 [139 Cal.Rptr. 469]; *Walker* v. *City of Salinas, supra,* 56 Cal.App.3d 711, 716.) Courts using this approach have also stated, however, that this test for determining the scope of the initiative and referendum powers at the local level is in addition to the usual test for determining whether a measure is administrative or legislative (*Hughes* v. *City of Lincoln, supra,* at pp. 744-745) and that acts are deemed administrative for purposes of this test "which, in a purely local context, would otherwise be legislative . . . ." (*Yost* v. *Thomas, supra,* 36 Cal.3d 561, 570.)

This use of an administrative characterization for delegated powers is an unnecessary fiction. The state's plenary power over matters of statewide

concern is sufficient authorization for legislation barring local exercise of initiative and referendum as to matters which have been specifically and exclusively delegated to a local legislative body.

COST makes a related argument, based on a footnote in *Associated Home Builders, supra,* 18 Cal.3d 582. In that footnote we disapproved language in certain decisions asserting that general law cities could not adopt zoning ordinances by initiative and in so doing we expressly distinguished "those decisions which bar the use of the initiative and referendum in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state." (At p. 596, fn. 14.)

Relying on this language, COST argues that the initiative is barred as to matters of statewide concern *only* when the state has preempted the field in question by enacting a pervasive system of regulation. We conclude that COST has misread the language in question.

The existence of a pervasive system of regulation is significant as evidence of a legislative intent to delegate exclusively to a local legislative body and as evidence that the matter is indeed one of statewide concern but it is not a prerequisite to the validity of the exclusive delegation. Where the legislative intent to delegate exclusively is otherwise clear, and the legislation addresses a matter of statewide concern, the absence of a pervasive system of regulation is of no consequence.

We conclude, accordingly, that section 66484.3 violates neither the home rule nor the municipal initiative provisions of the state Constitution.

## IV. CONCLUSION

In enacting section 66484.3 the state has enabled and encouraged local governments in Orange County to engage in the funding and construction of major highways, a matter of statewide importance. We have concluded that the Legislature intended that the authority thus delegated be exercised by the local legislative bodies specifically and exclusively, thereby precluding use of the initiative and referendum in this limited area. We have also concluded that section 66484.3 does not violate the home rule or municipal initiative provisions of the state Constitution. These conclusions make it unnecessary to consider other contentions urged by the initiative opponents.

The judgment of the Court of Appeal denying the petition for writ of mandate is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., and Eagleson, J., concurred.

**MOSK, J.**—I dissent.

" '[I]t has long been our judicial policy to apply a liberal construction to [the initiative] power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' " (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; see *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 628 [191 P.2d 426].) The majority make no attempt to resolve doubts in accordance with this important policy; instead of jealously guarding " 'one of the most precious rights of our democratic process' " (*Associated Home Builders, supra,* 18 Cal.3d at p. 591), they appear to seek doubts they can resolve *against* the initiative power.

The majority's analytical methods are in error. Instead of applying the well-established tests for determining the validity of a proposed local initiative (see, e.g., *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 569-570 [205 Cal.Rptr. 801 [685 P.2d 1152]; *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 521 [169 Cal.Rptr. 904, 620 P.2d 565]; *Associated Home Builders, supra,* 18 Cal.3d at p. 596, fn. 14; *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 129 [222 P.2d 225]; *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 557), the majority assert that the "first point to be determined" is whether Government Code section 66484.3 (hereafter "section 66484.3") can be construed in such a way as to *preempt* the proposed initiative. (*Ante,* p. 501.) Having thus set their course, they proceed to find such a construction; only then do they reach the applicable standards, which—citing no authority—they summarily cast aside as "unnecessary fiction." (*Ante,* p. 501.)

Article II, section 11, of the California Constitution provides for the initiative and referendum powers not as a right *granted* to the people, but as a power *reserved* by them. (*Associated Home Builders, supra,* 18 Cal.3d at p. 591; *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225, 231 [118 Cal.Rptr. 158, 529 P.2d 582]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804; 809 [270 P.2d 481]; *Ley* v. *Dominguez* (1931) 212 Cal. 587, 593 [299 P. 713]; *Dwyer* v. *City Council* (1927) 200 Cal. 505, 513 [253 P. 932].) The electorate's initiative power is "coextensive with the power of the Legislature" (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 669 P.2d 17]); the general rule is that "in situations where a municipal legislative body may enact an ordinance, so also may the

city's electors by the initiative process." (*Gibbs* v. *City of Napa* (1976) 59 Cal.App.3d 148, 157 [130 Cal.Rptr. 382].)

However, we have long recognized that "the efficiency necessary to the successful administration of the business affairs of a city" (*Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 611 [150 P. 977]) requires that the general rule apply only to the local body's *legislative* acts, and not to those which are merely *administrative*. (*Yost* v. *Thomas, supra,* 36 Cal.3d at pp. 569-570.) The majority find this longstanding distinction "awkward and confusing" (*ante,* p. 511); I do not.

When, as here, a local proposal deals with a subject affected by state law, the test is simple: an act is administrative if it "deals with a subject which is 'one of statewide concern in which the Legislature has delegated decision-making power, not to the local electors, but to the local council or board *as the state's designated agent for local implementation of state policy.*'" (*Merriman* v. *Board of Supervisors* (1983) 138 Cal.App.3d 889, 892 [188 Cal.Rptr. 343], italics added.) Stated another way, an act is deemed administrative when the "state has acted to *establish* the basic policy and has vested the responsibility for *carrying out* that policy" in the local board or council. (*Simpson* v. *Hite, supra,* 36 Cal.2d at p. 130, italics added.)

When, on the other hand, the act in question "is an exercise of the police power constitutionally delegated to counties and cities (Cal. Const., art. XI, § 7), it is likely to constitute an act of legislation rather than administration." (*Merriman* v. *Board of Supervisors, supra,* 138 Cal.App.3d at p. 892.) If the matter involved is of local rather than statewide concern, "a local decision which is intrinsically legislative retains that character *even in the presence of a state law authorizing or setting limits on the particular field of action.*" (*Hughes* v. *City of Lincoln* (1965) 232 Cal.App.2d 741, 745 [43 Cal.Rptr. 306], italics added.)

Thus the true "first point to be determined" here is whether section 66484.3 (1) establishes a "basic state policy" that the city councils are bound to carry out—in which case their decisions are "administrative" and beyond the reach of the electorate's initiative power, or (2) merely authorizes the city councils to exercise their constitutionally delegated police powers in a particular manner if they so choose—in which case their decisions are "legislative" and subject to the initiative. Section 66484.3 obviously invokes the latter.

The only "basic state policy" evident in section 66484.3 is *no* policy. The Legislature has explicitly given each individual city in Orange County complete and total discretion as to whether it will or will not enact a develop-

ment fee ordinance. Even if, as the majority assert, the Legislature passed section 66484.3 to "facilitate local action" (*ante,* p. 509), the only action being facilitated is the exercise of each city's constitutionally guaranteed power to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) The statute neither compels any city to act nor mandates that one inch of state highway ever be built. It simply authorizes each city to make a *local* decision regarding whether *local* taxpayers will pay fees. Such a decision is intrinsically legislative and clearly subject to the electorate's initiative power.[1]

Further, to find a "basic state policy" here would be to hold that virtually any local discretionary decision made under color of a special "authorizing" state statute is immune from the initiative power. The law is otherwise (*Hughes* v. *City of Lincoln, supra,* 232 Cal.App.2d at p. 745), and for good reason: "if the constitutional power reserved by the people can be abridged by special statutes, then by enacting a host of special statutes the Legislature could totally abrogate that power." (*Associated Home Builders, supra,* 18 Cal.3d at p. 595.)

The majority, in their failure to protect the initiative power, appear willing to risk such abrogation. After correctly observing that the state may preempt the entire field in matters of statewide concern, they boldly assert that "[i]f the state chooses instead to grant some measure of local control and autonomy, it has authority . . . to bar the exercise of the initiative and referendum." (*Ante,* p. 511.) Thus the majority apply a hitherto unknown standard: as long as the Legislature *could have* preempted the field, it can bar the electorate from exercising its reserved initiative and referendum powers. As I will explain, this conclusion does more than simply misstate California law; it violates the California Constitution.

---

[1] It is illuminating to compare Irvine's discretion under section 66484.3 with that of the City of Santa Barbara under the California Coastal Act (Pub. Resources Code, § 30000 et seq.). That act, among other things: (1) explicitly enumerates "the basic goals of the state" for the entire California "coastal zone" (*id.*, § 30001.5); (2) *requires* each local government within the coastal zone to prepare and submit a land use plan to the California Coastal Commission (*id.,* § 30500, subd. (a)); and (3) sets forth specific policies establishing standards by which the adequacy of the local coastal programs is determined (*id.*, §§ 30200-30264).

In *Yost* v. *Thomas,* we considered whether this statutory scheme precluded the local electorate's exercise of the referendum power with regard to the city council's actions under a land use plan already approved by the commission. (36 Cal.3d at p. 564.) We unanimously concluded it did not prohibit the referendum, because the act "leaves *wide discretion* to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans. Under such circumstances a city is acting *legislatively* and its actions are subject to the normal referendum procedure." (*Id.* at p. 573, italics added.)

If wide discretion in determining how to comply with mandatory state regulations is sufficient to render local acts legislative, is not complete discretion under a statute merely authorizing local actions sufficient to do the same?

The majority's abandonment of the long established "legislative/administrative" dichotomy in favor of their novel "could have preempted the field" standard is utterly unsupported by the case law. The three cases cited by the majority as authority for their radical departure not only fail to support the majority's position: *all three apply the very standard the majority seek to abandon.* (See *Ferrini* v. *City of San Luis Obispo* (1983) 150 Cal.App.3d 239, 249 [197 Cal.Rptr. 694] ["It has long been established that the powers of initiative and referendum reserved to the people of the cities apply 'only to the acts of the city council . . . which are exercises of its legislative power' "]; *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 562 [11 Cal.Rptr. 340] [" 'The provisions of the charter of the city relating to the initiative apply only to its legislative acts,' " quoting *Riedman* v. *Brison* (1933) 217 Cal. 383, 387]; *Riedman* v. *Brison, supra,* 217 Cal. at p. 387 ["The provisions of the charter of the city relating to the initiative apply only to its legislative acts"].)

Furthermore, in two of the three cases the initiative was barred because the Legislature *did* preempt the field. (See *Ferrini* v. *City of San Luis Obispo, supra,* 150 Cal.App.3d at p. 246 ["we are persuaded that the Legislature's intent to occupy the field . . . is clearly established"]; *Mervynne* v. *Acker, supra,* 189 Cal.App.2d at p. 564 ["the Legislature appears to have directly occupied that field"].) In the third, the court held the initiative was unavailable because, under the traditional analysis, the local legislative body acted as a mere agent bound to implement state policy. (*Riedman* v. *Brison, supra,* 217 Cal. at p. 387 ["the legislature . . . has designated the city council . . . as the state agency which may initiate proceedings"].)

Even more untenable than this citation of nonauthority, however, is the majority's reliance on it to avoid the constitutional implications of their holding. The 1911 amendment to the California Constitution, which provided for the initiative and referendum, stated: "This section is self-executing, but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved." (Former Cal. Const., art. IV, § 1.) In *Associated Home Builders,* this court interpreted that language to mean that "legislation which permits council action but effectively bars initiative action may run afoul of the 1911 amendment." (18 Cal.3d at p. 595; see *Legislature* v. *Deukmejian, supra,* 34 Cal.3d at p. 675; *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 821 [226 Cal.Rptr. 81, 718 P.2d 68].) As interpreted by the majority, section 66484.3 does exactly that: it permits each city council complete legislative discretion, yet bars initiative action. This interpretation plainly violates the people's initiative power reserved in article II, section 11, of the California Constitution.

In my view, the majority have abdicated both their duty to guard the initiative power (*Associated Home Builders, supra,* 18 Cal.3d at p. 591) and their responsibility to construe statutes, if possible, so as to harmonize with the Constitution (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; *Palermo* v. *Stockton Theaters, Inc.* (1948) 32 Cal.2d 53, 59-60 [195 P.2d 1]). I would reverse the decision of the Court of Appeal, and remand the case to that court with directions to issue a writ of mandate directing the superior court to vacate its previous judgment and order the Irvine City Council to submit the initiative to the voters of that city at the earliest opportunity.