OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

|  |  |
|---|---|
| OPINION | : |
| | :     No. 90-891 |
| of | : |
| | :     <u>OCTOBER 24, 1990</u> |
| JOHN K. VAN DE KAMP | : |
| Attorney General | : |
| | : |
| CLAYTON P. ROCHE | : |
| Deputy Attorney General | : |
| | : |

---

THE ALAMEDA COUNTY CENTRAL LABOR COUNCIL ET AL. ("Labor Council") have requested this office to grant leave to sue LIONEL J. WILSON ("Wilson") in quo warranto pursuant to section 803 of the Code of Civil Procedure to test his right to hold the office of mayor of the City of Oakland or in the alternative to hold the office of Oakland Port Commissioner.

CONCLUSION

Leave to sue is granted.

MATERIAL FACTS

On July 10, 1990, Wilson, the incumbent Oakland mayor, nominated himself to serve as a member of the Oakland Board of Port Commissioners, and the city council, on which the mayor also serves, appointed him to be a commissioner for a four year term. On July 11, 1990, Wilson took the oath of office as a commissioner and presently is performing the duties of mayor and commissioner for the City of Oakland. His term of office as mayor expires on January 7, 1991.

CRITERIA FOR QUO WARRANTO

Code of Civil Procedure section 803 authorizes the Attorney General to bring an action "in the name of the people . . . upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office. . . ." The action authorized is "in the nature of quo warranto." (*International Assn. of Fire Fighters* v. *City of Oakland* (1985) 174 Cal.App.3d 687, 693.) The Attorney General considers the following factors in determining whether to grant leave to sue: (1) whether the application has raised a substantial issue of law or fact and (2) whether it would be in the public interest to grant leave to sue. (72 Ops.Cal.Atty.Gen. 8, 9 (1989).)

LEGAL ISSUES

The issues presented are (1) whether the appointment of Wilson as port commissioner violated the common law rule or Oakland charter provision that prohibits self-appointments, and if it did not, (2) whether the offices of mayor and port commissioner are incompatible offices, the simultaneous holding of which is prohibited under common law rule or Oakland charter provision.

ANALYSIS

1.    Appointment As Port Commissioner

Oakland is a charter city which exercises "home rule" pursuant to its charter. (See Cal. Const., art. XI, §§ 3, 5.) The charter provides for a city council which consists of eight members and the mayor. (§ 200.) It creates a "Port Department" (§ 700) managed and controlled by a Board of Port Commissioners consisting of seven members. Each commissioner is nominated by the mayor, appointed by the city council for a four-year term, and serves without compensation. (§ 701.) With respect to the mayor and city council, section 1202 of the charter provides:

> "The Mayor and members of the Council shall not hold any other municipal office or any other office or employment to receive compensation from the City; or be appointed or elected to any office created by the Council while he is a member thereof, until at least one year shall have expired after the expiration of the term for which he was elected."

With respect to the mayor specifically, section 305 of the charter provides in part:

> "The Mayor shall devote his full time and attention to the duties of the Office of the Mayor and shall not engage in outside employment while in office. However, nothing shall prevent the Mayor from the receipt of income earned from business(s) or investments(s) in which he is not actively engaged and which are not in conflict with the performance of his duties and responsibilities."

With respect to port commissioners, section 701 provides in part:

> "No person shall be appointed as, or continue to hold office as, a member of the Board who is not at the time of his appointment, and has not been continuously for four (4) years immediately preceding his appointment, and who shall not continue to be during his term, a bona fide resident of the City of Oakland."

In 23 Ops.Cal.Atty.Gen. 75 (1954) this office discussed at length the common law rule against self-appointments. In that opinion we concluded that a city council could not appoint one of its members to a vacancy on the council the term for which would not expire for two years, even though the member first resigned his own term expiring in a few months. We noted (at p. 75):

> "There is no reported California case holding directly that an appointing board or commission may not appoint one of its members to office. In most of the states, however, there is a well-defined, court announced rule of public policy which prohibits a public board from conferring an appointment on one of its own members. This is the rule against self-appointment. . . . Authoritative legal texts pronounce the rule as one of general application. . . . It is referred to as a rule of common law. . . ."

After discussing the three California cases where this doctrine was discussed by way of dicta (*People* ex rel. *Moody* v. *Carter* (1936) 12 Cal.App.2d 105; *People* ex rel. *Bagshaw* v. *Thompson* (1942) 55 Cal.App.2d 147; and *City of Berkeley* v. *Jensen* (1947) 77 Cal.App.2d 921), we concluded:

> ". . . In view of the overwhelming weight of judicial authority in other states and the [favorable] dicta in the *Thompson* and *Jensen* cases, we do not believe the California courts would reject the rule against self-appointments as an expression of California public policy. . . ." (*Id*. at p. 77.)

Or as stated in one of the "authoritative legal texts" alluded to in our prior opinion, 3 McQuillin, Municipal Corporations (3d Ed. 1990) section 12.75, page 378:

> "Officers who have appointing power are usually disqualified for appointment to office to which they may appoint. <u>Such exercise of the appointive power is against public policy, and is void on its face,</u> and the one so appointed is not even a de facto officer. Statutes may provide, however, that officers having appointive power may appoint one of their number to an office, sometimes pro tempore, as where a city council is authorized in certain circumstances to name one of its members mayor pro tempore. And there may be at least color of statutory authority for the appointment by a council of its members to offices so as to render them de facto officers." (Fns. omitted, emphasis added.)

> The Labor Council argues that an application of this common law rule to our facts would mean that Wilson was ineligible to be appointed by the city council to the port commission and his appointment was invalid. Wilson, however, seeks to avoid this common law rule of public policy on the grounds that Oakland, as a "home rule" charter city, is not restricted by the common law and that any limitations on the city council's ability to appoint an individual to a city office must be found in the city charter itself. He then points to sections 305, 701, and 1202[1] of the charter, quoted above, and urges that these contain the sole limitations on the appointment of the mayor to the port commission.

> In 66 Ops.Cal.Atty.Gen. 293 (1983) we considered the effect of common law rules on the appointment of a charter city's planning commissioner to simultaneously hold the office of county planning commissioner. We concluded:

> ". . . Thus, the authority of a charter city [to authorize the holding of two offices at the same time] is not constrained by common law. The City may obviate, by appropriate legislation, the force and effect of the common law doctrine, thereby enabling the county to appoint a city planning commissioner as a county planning commissioner." (*Id.*, at p. 297.)

Likewise, we believe that Oakland, a charter city, could by appropriate legislation abrogate the common law rule against self-appointments. The Legislature has made common law rules generally applicable throughout California by enacting Civil Code section 22.2. The statute provides:

---

[1]With respect to section 1202, Wilson argues that a "municipal office" must be for compensation before the mayor is prohibited under that section from holding another municipal office. We will discuss this argument later.

"The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State is the rule of decision in all the courts of this State."

In 66 Ops.Cal.Atty.Gen. 293, *supra*, we concluded that the "laws of this State" included ordinances adopted by cities and counties. (*Id.*, at pp. 298-300.) Accordingly, although a city or county normally may not adopt an ordinance inconsistent with a state statute (Cal. Const., art. XI, § 7; *Griffis* v. *County of Mono* (1985) 163 Cal.App.3d 414, 425-426), here Civil Code section 22.2 itself "authorizes" such inconsistency with respect to common law rules.

This result would be equally applicable to charter cities. Although "ordinances enacted in a charter city relating to matters which are purely municipal affairs prevail over state laws covering the same subject" (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 505), "[a]s to matters which are of statewide concern, . . . home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters" (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61). Civil Code section 22.2, establishing the common law "in all the courts of this State," appears to address a matter of statewide concern. (See *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136; *City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 533.) Hence, Oakland would be subject to common law rules pursuant to Civil Code section 22.2, even though the qualifications for city offices might otherwise be considered a "municipal affair" over which a charter city normally has plenary authority. (See *City of Downey* v. *Board of Administration* (1975) 47 Cal.App.3d 621, 629; *Hiller* v. *City of Los Angeles* (1961) 197 Cal.App.2d 685, 689.)

The issue remains, however, as to whether and to what extent Oakland has abrogated the common law rule against self-appointments. When the question arises as to whether the Legislature has abrogated the common law, the following analysis set forth in *Gray* v. *Sutherland* (1954) 124 Cal.App.2d 280, 290, applies:

". . . The correct rule as to the relation of the common law and the statutory law is stated in part as follows in 15 Corpus Juris Secundum, page 620: `. . . the common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject.' Among the authorities cited in support of the above statement is *Estate of Elizalde*, 182 Cal. 427. See also *Guardianship of Reynolds,* 60 Cal.App.2d 669, 674, where it is said: `Statutes are not presumed to alter the common law otherwise than the act expressly provides.'"

(See also *Saala* v. *McFarland* (1965) 63 Cal.2d 124, 130; *Blevins* v. *Mullally* (1913) 22 Cal.App. 519, 533.) The Labor Council argues that the same reasoning would be applicable to a charter city when it purports to abrogate the common law.

Looking at the provisions of Oakland Charter sections 305, 701, and 1202, we find that Wilson meets the qualifications specified in section 701 for being a port commissioner and arguably would not violate the prohibition against "outside employment" contained in section 305. While section 1202 expressly prohibits the appointment of the mayor "to any office created by the Council," it does not address appointments to offices created by the Oakland Charter such as the Board of Port Commissioners. A substantial issue is thus raised as to whether Oakland has changed the common law rule "'by implication or otherwise'" or "'expressly'" (*Gray* v. *Sutherland, supra*, 124 Cal.App.2d 280, 290) with respect to appointments to the office of port commissioner by the city council.

Accordingly, we believe that significant issues of law are raised herein as to the applicability of the rule against self-appointments in Oakland under either common law or charter provision with respect to the appointment of Wilson as a port commissioner. If a court were to determine that the rule governed so as to preclude the appointment here, Wilson's appointment would be "void on its face." (3 McQuillin, *supra*, at p. 378.)

### 2. Possible Incompatibility of Offices

The second major area of law giving rise to legal issues herein concerns whether the offices of mayor and port commissioner are incompatible offices. In 66 Ops.Cal.Atty.Gen. 176, 177-178 (1983) we summarized the common law rule prohibiting the simultaneous holding of incompatible offices as follows:

"`Offices are incompatible, in the absence of statutes suggesting a contrary result, if there is any significant clash of duties or loyalties between the offices, if the dual office holding would be improper for reasons of public policy, or if either officer exercises a supervisory, auditory, or removal power over the other.' (38 Ops.Cal.Atty.Gen. 113 (1961).

" . . . . . . . . . . . . . . . . . . . . . . . .

"The policy set forth in *People* ex rel *Chapman* v. *Rapsey*, *supra*, 16 Cal.2d 636 comprehends prospective as well as present clashes of duties and loyalties. (See 63 Ops.Cal.Atty.Gen. 623, *supra*.)

"`. . . Neither is it pertinent to say that the conflict in duties may never arise, it is enough that it may, in the regular operation of the statutory plan. . . .' (3 McQuillin, Municipal Corporations (3d Ed. 1973, § 12.67, p. 297).

"`[O]nly one significant clash of duties and loyalties is required to make . . . offices incompatible. . . .' (37 Ops.Cal.Atty.Gen. 21, 22 (1961).) Furthermore, `[t]he existence of devices to avoid . . . [conflicts] neither changes the nature of the potential conflicts nor provides assurance that they would be employed.' (38 Ops.Cal.Atty.Gen. 121, 125 (1961).) Accordingly, the ability to abstain when a conflict arises will not excuse the incompatibility or obviate the effects of the doctrine. A public officer who enters upon the duties of a second office automatically vacates the first office if the two are incompatible. (*People* ex rel. *Chapman* v. *Rapsey*, *supra*, 16 Cal.2d 636, 644.)"

Initially, it is to be noted that if one office has removal power over the other office, they are incompatible under common law principles. We are advised by the Labor Council and Wilson that the city council, of which the mayor is a member, may remove port commissioners for cause.

Wilson, however, seeks to avoid the doctrine of incompatibility of office on the grounds that the mayor is but one of nine votes on the council, and only six votes are needed to remove a port commissioner. He also urges that such power as to him personally will expire in several months. However, as noted in the principles concerning incompatibility of office outlined above, the ability of an officer to abstain when a conflict arises will not obviate the effects of the doctrine. Or as stated in *People* ex rel. *Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 641:

"`Two offices are said to be incompatible when the holder cannot <u>in every instance</u> discharge the duties of each . . . .'" (Emphasis added.)

Likewise, the fact that an incompatibility will be of short duration is immaterial as to whether, upon acceptance of the second office, the first office was automatically vacated.

In addition to the power of removal, the Labor Council's application for leave to sue raises a number of alleged actual or potential clashes of duties and loyalties between the office of mayor and the office of port commissioner such as: (1) the city council sets police and fire protection services fees for the port department; (2) the city council negotiates with the port commissioners regarding the repayment of a debt of the port department to the city and the allocation of funds between principle and interest on such debt; (3) the port department has the power to relinquish to the council property in the "port area" and the city council has the power to enlarge the "port area"; (4) the city council has the power to exercise eminent domain within the "port area" on behalf of the city; and (5) the city council has the power to approve or reject the budget submitted by the port commissioners.

Wilson argues that the incompatibility doctrine is inapplicable here because the mayor and the port commissioners "serve only one master," the City of Oakland. However, that is not the test. Offices within the same jurisdiction can be incompatible. (See, e.g. 68 Ops.Cal.Atty.Gen. 7 (1985) [offices of deputy sheriff and county supervisor are incompatible]; 38 Ops.Cal.Atty.Gen. 121 (1961) [office of county counsel and public guardian are incompatible].)

Likewise, Wilson's argument that his serving on the Oakland Port Commission is similar to his service on the Oakland Redevelopment Agency does not avoid the doctrine. With respect to the redevelopment agency, such dual office holding is authorized by state statute. (See Health & Saf. Code, § 33200 et seq.)

Accordingly, it is evident from the foregoing discussion that substantial questions of law are presented as to whether the office of the mayor and port commissioner are incompatible offices under the common law rule.

3.    Section 1202 of the City Charter

As noted at the outset, section 1202 of the Oakland Charter provides:

"The Mayor and members of the Council shall not hold any other municipal office or any other office or employment to receive compensation from the City. . . ."

Wilson reads this provision as if the phrase "to receive compensation from the City" modifies all antecedents, including "municipal office." Under his interpretation, since port commissioners serve without compensation, section 1202 does not preclude the mayor from also being a port commissioner.

We believe, however, that a substantial issue is raised as to the proper interpretation of this charter provision. As stated in *In Re Marriage of Wight* (1989) 215 Cal.App.3d 1590, 1595:

". . . Relative or modifying phrases are to be applied to the words immediately preceding them and are not to be construed as extending to more remote phrases unless the context or the evident meaning of the statute requires a different construction. (*Oliva* v. *Swoap* (1976) 59 Cal.App.3d 130, 138.). . . ."

An application of this rule of construction would mean that receipt of compensation modifies only "any other office or employment" and does not extend to the remote words "municipal office."

Accordingly, section 1202 could be interpreted in conformity with the common law rules against self-appointments and the simultaneous holding of incompatible offices by a finding that (1) Wilson was ineligible to be appointed to the Oakland Port Commission in the first instance or alternatively (2) that by accepting a second municipal office, he forfeited his office as mayor.

### 4. The Public Interest

Finally, Wilson urges that the public interest would not be served by granting the Labor Council's application for leave to sue in quo warranto, since only a few months of overlap remain in the dual office holding. Wilson's term as mayor expires on January 7, 1991.

Such argument does not meet the question of whether Wilson was validly appointed as a port commissioner. If we were considering only the incompatibility of office question and Wilson's right to the office of mayor, his argument might have some merit. However, he has over three years remaining in his term as a port commissioner. If he was ineligible to be appointed in the first instance, we cannot say that he would be reappointed or even nominated after the expiration of his term as mayor. The new mayor will have the power of nomination with respect to vacancies on the port commission.

We believe that it would be in the interests of the public to institute proceedings pursuant to Code of Civil Procedure section 803 to test whether Wilson was validly appointed to the Oakland Port Commission or in the alternative whether he has vacated his office as mayor. These are substantial questions of law, and the people of Oakland have a significant interest in their judicial resolution.

Speculating in how a court may ultimately resolve these questions with respect to these public offices is not the function of the Attorney General. "In deciding whether or not to grant leave to sue, this office does not reach a determination concerning which party would or is likely to prevail before a court." (71 Ops.Cal.Atty.Gen. 15, 19 (1984).) As we observed in 12 Ops.Cal.Atty.Gen. 340, 341 (1949):

> "In acting upon an application for leave to sue in the name of the people of the State, it is not the province of the Attorney General to pass upon the issues in controversy, but rather to determine whether there exists a state of facts or question of law that should be determined by a court in an action quo warranto; that the action of the Attorney General is a preliminary investigation, and the granting of the leave is not an indication that the position taken by the relator is correct, but rather than the question should be judicially determined and that quo warranto is the only proper remedy."

The application of the Labor Council for leave to sue is granted in accordance with the terms of Code of Civil Procedure sections 803-810.

* * * * *