[No. D049027. Fourth Dist., Div. One. May 24, 2007.]

In re MARY G., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
JENNIFER G. et al., Defendants and Appellants.

188

### COUNSEL

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant Jennifer G.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant Frank G.

John J. Sansone, County Counsel, John E. Philips, Chief Deputy Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Carl Fabian, under appointment by the Court of Appeal, for Minor.

### OPINION

**McCONNELL, P. J.**—Jennifer G. and Frank R. appeal a juvenile court judgment terminating their parental rights over Mary G. and choosing adoption as the permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Jennifer contends the court abused its discretion by denying her section 388 petition for modification, and there is not substantial evidence to support the court's

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

finding the beneficial parent-child relationship exception to adoption is inapplicable. We conclude these contentions are without merit.

Frank, however, persuasively asserts the court violated his constitutional rights to equal protection and full faith and credit principles by not recognizing him as a presumed father entitled to reunification services as a matter of right based on a voluntary acknowledgment of paternity, merely because it was made in Michigan and not California. We reverse the judgment as to Frank *and* Jennifer because with exceptions not relevant here, the termination of parental rights must be made at the same time. We also reverse the judgment because, as both parents contend, San Diego County Health and Human Services Agency (the Agency) violated notice requirements of the Indian Child Welfare Act of 1978 (ICWA). (25 U.S.C. § 1901 et seq.)

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Jennifer has an extensive history with drugs, drug-related arrests and child protective services in San Diego County. Jennifer lost her parental rights to her three older children because of her drug use. When her son was born in 1997, he tested positive for cocaine and opiates and suffered withdrawal symptoms. When her twin daughters were born prematurely in 1999, they tested positive for methamphetamine. Jennifer was offered services, but she failed to reunify with the children and they were adopted.

In April 2002 Mary was born to Jennifer in Michigan. It is undisputed that Frank is Mary's biological father, Jennifer and Frank were living together at the time of the birth, he was at the hospital for the birth, he is listed as the father on the birth certificate, and under Michigan law he signed a voluntary affidavit of paternity and was ordered to pay child support.

Shortly after the birth, Jennifer and Frank split up and he had no contact with Mary. At some point, Jennifer returned to the San Diego area, and on November 2, 2005, she was arrested for possession of a methamphetamine pipe and marijuana, being under the influence of drugs, and child endangerment based on Mary's presence during the incident. The Agency placed Mary in foster care and on November 7 filed a petition on her behalf under section 300, subdivision (b).

The Agency recommended that Jennifer receive no reunification services because she was offered services during the proceedings for her three older children, to no avail. Further, Jennifer denied there was any problem and was

---

[2] We set forth the facts pertaining to the ICWA issues in the discussion portion of this opinion.

uncooperative with the Agency regarding the voluntary undertaking of services. Jennifer reported she was already receiving drug treatment at the McAlister Institute and she did not "need the agency to dictate to her what she needs to do."

In a paternity questionnaire filed November 7, Jennifer identified Frank as Mary's father and stated a judgment of paternity had been made in Michigan in 2003. Jennifer was unaware of his whereabouts and the Agency undertook a search for him.

Shortly before the January 5, 2006 jurisdiction and disposition hearing, the Agency located Frank in Louisiana. At the hearing the court amended the petition to name him as an alleged father, appointed counsel for him and ordered that he be notified of the proceedings. The court made a true finding on the petition and declared Mary a dependent. After taking judicial notice of the dependency files of Jennifer's three older children, the court denied her reunification services under section 361.5, subdivision (b)(10) and (11), and scheduled a permanency planning hearing under section 366.26 for May 3, 2006.[3]

The court noted it proceeded without Frank because he was an alleged father and "[t]here is nothing to indicate that he has been part of this child's life." The court explained there was no prejudice to Frank because if he "is blameless, and he is a good father, he could file a [section] 388 [petition] and request custody, and he would be in the same position [as] . . . if he came in today with counsel and was able to assume custody."

On February 10, 2006, Frank requested a special hearing on the ground he "believes he is [Mary's] presumed father." He requested a judgment of paternity.

Frank did not appear at the February 22, 2006 hearing. Frank submitted a paternity questionnaire that stated Michigan had entered an order in 2003 that determined he is Mary's father and required him to pay child support. The questionnaire stated Frank and Jennifer lived together when Mary was born, he signed a declaration at the hospital after her birth that stated he was her father, he told his sister he was the father, and he agreed to be named and was named on the birth certificate. Frank also presented a copy of an August 2005 "Notice of Order to Withhold Income for Child Support" (some capitalization omitted) that was sent by a family law court in St. Joseph County, Michigan,

---

[3] Jennifer filed a notice of the intent to challenge the judgment by way of a writ petition. She later notified this court, however, that she did not plan to file a petition for writ of mandate, as there were no viable issues for writ review. Accordingly, we dismissed the matter.

to Frank's employer in Louisiana. The notice ordered the employer to withhold and remit $84.80 weekly from Frank's paychecks for child support under a Michigan order.

Frank's counsel represented that Frank had no contact with Mary after she was about four months old, but "to the best of his recollection he signed something in Michigan that he believes would be akin to a paternity declaration at the time of birth." Frank, however, did not have a copy of the document. The court advised, "I am not going to find that he is a presumed father. I can't under the facts." The court entered a judgment of paternity, but continued Frank's alleged father status. The court invited Frank to file a section 388 petition to request reunification services.

On March 6, 2006, Frank filed a petition for modification under section 388, seeking custody of Mary, or alternatively, reunification services and an evaluation of his home in Louisiana. The petition stated Frank "is anxious to reestablish a relationship with Mary" and he "believes it is in her long term best interest to be with him."

The Agency opposed the section 388 petition. The social worker explained Frank "claims . . . he was sent to jail due to a domestic violence incident that occurred between the couple. He stated that when he got out, he was at the hospital for Mary's birth. However, after 3–4 months, the couple broke up and . . . Jennifer would not let him have contact with Mary. [Frank] stated that he did 'not want to argue with her' and did not pursue a relationship with Mary. He stated that he contacted her one other time and Jennifer told him to 'leave them alone.' He stated that [he] did leave them alone because 'he did not want to cause problems.' " Frank told the social worker he eventually moved from Michigan back to San Diego, where he was homeless. Frank admitted to "multiple arrests in California including burglary and infliction of corporal injuries, which date back to 1982." Frank reported he moved to Louisiana in 2005 and he had been employed in the landscape field for nine months.

Jennifer told the social worker Frank was jailed for a domestic violence incident when she was four months pregnant. He attended Mary's birth, but when she was two weeks old he left. He appeared about a year later and asked for visitation, but Jennifer refused because he had not had any counseling or therapy. She had not heard from him since. The social worker wrote "[t]here is no indication that his lifestyle is different from when he was involved with the domestic violence or that placing Mary with him would be in her best interest and not pose further risk to her."

Frank did not appear at the April 4, 2006 hearing. A copy of Mary's birth certificate was submitted, which named him as her father. The court denied an evidentiary hearing on Frank's section 388 petition and confirmed that the section 366.26 hearing would proceed on May 3.

In its assessment report, the Agency recommended the termination of parental rights and adoption as the permanent plan. The social worker found "Mary is adoptable due to her young age, good health, lack of significant developmental delays, and her ability to attach to new caregivers. It does not appear that her relationship with her mother prevents her [from] adjusting and thriving in new environments." The Texas couple who adopted Jennifer's twin girls remained committed to adopting Mary, and the twins had ongoing contact with the maternal grandparents, who adopted Jennifer's son. Additionally, there were 40 other adoptive families willing to adopt a child with Mary's characteristics.

The court continued the permanency planning hearing to June 23. On May 26, Jennifer filed a petition for modification under section 388. Jennifer argued she should receive reunification services because she had been attending Narcotics Anonymous (NA) meetings and drug testing, and was "seeking mental health treatment as well." The petition stated the McAlister Institute believed Jennifer "has real mental health issues that a non-dual diagnosis program, such as MITE, could not have adequately addressed in the past. . . . [¶] [Jennifer] has never been in a treatment program which could have adequately addressed her mental health issues. She has never had continuous treatment and supervision from a mental health professional or psy[ch]iatrist who could prescribe and monitor needed medication."

Jennifer submitted evidence that on March 15, 2006, she completed a residential detoxification program at McAlister Institute; she regularly attended NA meetings between August 24 and September 15, 2005, and March 5 and April 3, 2006; and, she passed two or three drug tests performed in late March. She also submitted an April 3, 2006 letter from a marketing company that attested to her employment beginning mid-November 2005, and stated she "has demonstrated work habits that indicate she has the potential to be a valuable addition to our company."

At the June 20, 2006 hearing, Jennifer reported she began a dual diagnosis treatment program four or five days earlier. She argued that if she "had a chance to get better through her dual diagnosis program, she would be able to provide a stable, loving, nurturing environment" for Mary. The court denied an evidentiary hearing on her section 388 petition.

On June 23, the court temporarily suspended Jennifer's visitation because of her mental condition. The court also rescheduled the section 366.26 hearing for July 18.

On July 13, Frank filed another section 388 petition to request 12 months of reunification services. He submitted a copy of an "Affidavit of Parentage" (some capitalization omitted) from Michigan, dated two days after Mary's birth. The affidavit acknowledged its completion was voluntary, the mother would have custody absent court order or agreement of the parents, either parent could assert in court a request for parenting time or custody, both parents had the responsibility to support the child, and by signing the affidavit the parents waived the right to genetic testing, appointed counsel or a trial to determine if the man is the biological father. The affidavit was signed by Frank and Jennifer, and signed and notarized by a witness.

At the July 18 hearing, which Frank did not attend, the court denied an evidentiary hearing on his second section 388 motion. The court rejected the argument that the Michigan affidavit gave Frank presumed father status under California law. The court noted the California "statute specifically sets out that the Department of Child Support Services in consultation with the State Department of Health Services, the California Association of Hospitals and Health Systems and other affected health provider organizations will work to develop this form. [¶] This specifically talks about California, and an analogy may be drawn, but that would be truly rewriting the law if I decided to honor these Michigan documents and . . . find that this guy is a presumed father under our laws. That would be in my mind absolutely legal error." The court explained that as a biological father, Frank's entitlement to reunification services was discretionary, and the provision of services was not in Mary's best interest.

Jennifer testified she was in the Serenity House residential program and was being treated for drug dependency and bipolar disorder. She had been taking lithium and Seroquel for approximately three weeks and they minimized her anxiety.

The court found by clear and convincing evidence that Mary is adoptable and would not benefit from further contact with her parents. The court terminated parental rights and found adoption is in Mary's best interest. Further, the court authorized Mary's immediate placement in Texas with her half sisters.

DISCUSSION

I

*Frank's Appeal*

A

■ In California, the "statutes governing dependency proceedings differentiate the rights of presumed, natural, and alleged fathers. [Citation.] The Uniform Parentage Act of 1973, originally adopted by our Legislature as Civil Code section 7000 et seq. and reenacted without substantive change as Family Code section 7600 et seq. [citation], distinguishes between presumed and merely biological fathers. [Citation.] 'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . . A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.' " (*In re Liam L.* (2000) 84 Cal.App.4th 739, 745 [101 Cal.Rptr.2d 13].) "Presumed father status ranks highest. Only a 'statutorily presumed father' is entitled to reunification services under . . . section 361.5, subdivision (a) and custody of his child under . . . section 361.2." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123].) Ordinarily, a best interests standard is inapplicable in determining whether a presumed father is entitled to reunification services. (*In re Eric E.* (2006) 137 Cal.App.4th 252, 259 [39 Cal.Rptr.3d 894] (*Eric E.*).)

■ Family Code section 7611 generally sets forth the exclusive means for an unwed father to establish presumed fatherhood. (*In re Zacharia D.* (1993) ·6 Cal.4th 435, 449 [24 Cal.Rptr.2d 751, 862 P.2d 751].) Under subdivision (d) of Family Code section 7611, a man is a presumed father if "[h]e receives the child into his home and openly holds out the child as his natural child." "The law gives presumed father status to those who have taken an active role in their children's lives . . . ." (*In re Liam L., supra,* 84 Cal.App.4th at pp. 745–746.)

■ Further, in 1994 the Legislature amended Family Code section 7611 to provide that alternatively, a man is a presumed father "if he meets the conditions provided in . . . Chapter 3 (commencing with Section 7570) of Part 2," which pertains to the establishment of paternity by voluntary declaration. Family Code section 7573 provides that with exceptions not relevant here, "a completed voluntary declaration of paternity, as described in Section 7574, that has been filed with the Department of Child Support Services shall establish the paternity of a child and shall have the same force

and effect as a judgment for paternity issued by a court of competent jurisdiction. The voluntary declaration shall be recognized as a basis for the establishment of an order for child custody, visitation, or child support."

■ Under Family Code section 7574, subdivision (a) the "voluntary declaration of paternity shall be executed on a form developed by the Department of Child Support Services in consultation with the State Department of Health Services, the California Family Support Council, and child support advocacy groups." The form must contain certain information, including statements by the parents that they have read and understand the written materials described in Family Code section 7572; a statement by the mother that the man who has signed the voluntary declaration of paternity is the only possible father, and she consents to the establishment of paternity by signing the declaration; and, a statement by the man that "he understands that by signing the voluntary declaration of paternity he is waiving his rights as described in the written materials, that he is the biological father of the child, and that he consents to the establishment of paternity by signing the voluntary declaration of paternity." (Fam. Code, § 7574, subd. (b)(5), (6); see also § 7572.)

B

The Agency contends, and the juvenile court found, that an out-of-state voluntary declaration of parentage can never confer presumed father status in a California dependency proceeding simply because the Declaration was not made on a California form or filed with the Department of Child Support Services, as required by Family Code section 7574. The Agency concedes that had Mary been born in California and had Frank signed here the identical form he signed in Michigan, he would qualify as a presumed father. Frank asserts that to any extent California's statutory scheme precludes him from being designated a presumed father based solely on geography, it violates his constitutional equal protection rights. We agree with Frank.

■ " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' " (*In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 522].) "It is basic that the guarantees of equal protection embodied in the Fourteenth Amendment to the United States Constitution and article I, sections 11 and 21, of the California Constitution, prohibit the state from arbitrarily discriminating among persons subject to its jurisdiction. This principle, of course, does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose. [Citations.] Moreover, 'in cases

involving "suspect classifications" or touching on "fundamental interests" . . . the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that distinctions drawn by the law are *necessary* to further its purpose.' " (*In re King* (1970) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983] (*King*).)

■ Frank is similarly situated to fathers who have voluntarily acknowledged paternity in California. Under both California and Michigan law, a voluntary acknowledgment of paternity shall be recognized as a "basis" for court-ordered child support, custody or visitation. (Fam. Code, § 7573; Mich. Comp. Laws, § 722.1004.) Moreover, both California and Michigan law have similar purposes. In California, "[w]ith the adoption of the statutory scheme on voluntary declarations of paternity, Family Code section 7570 et seq., the Legislature declared that there was a compelling state interest in establishing paternity for all children, with the goal of providing children with support awards and with equal access to benefits such as Social Security, health insurance, and inheritance rights, and found that 'Knowledge of family medical history is often necessary for correct medical diagnosis and treatment. Additionally, knowing one's father is important to a child's development.' [Citation.] [¶] The Legislature further found that a simple system for voluntary paternity declarations would result in a significant increase in the ease of establishing paternity and a significant decrease in the time and money needed to establish paternity, and was in the public interest." (*County of Los Angeles v. Sheldon P.* (2002) 102 Cal.App.4th 1337, 1339–1340, fn. omitted [126 Cal.Rptr.2d 350].) Michigan's Acknowledgment of Parentage Act provides a simple procedure "to establish paternity and provide support for children born out of wedlock." (*Sinicropi v. Mazurek* (2006) 273 Mich.App. 149 [729 N.W.2d 256, 265].)[4]

---

[4] Michigan's Acknowledgement of Parentage Act, effective June 1, 1997, and amendments to California's statutory scheme for the voluntary acknowledgment of paternity (Fam. Code, § 7570 et seq.) were presumably adopted to satisfy federal law. "In 1996 Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act, commonly known as the Welfare Reform Act. [Citations.] Under the Welfare Reform Act, a program entitled Temporary Aid to Needy Families (TANF) provided states with block funding to distribute to needy families as each state saw fit. [Citations.] TANF replaced the federally funded AFDC program." (*Sneed v. Saenz* (2004) 120 Cal.App.4th 1220, 1231 [16 Cal.Rptr.3d 563].) "A state's participation in the TANF program is voluntary, but if a state chooses to participate, its plan must comply with the requirements of the Social Security Act and the regulations promulgated thereunder. [Citations.] . . . [Citations.] One of the requirements of TANF participation is that a state must operate a child support enforcement program in compliance with Title IV-D [of the Social Security Act]. 42 U.S.C. § 602(a)(2) (2000). Among the requirements of Title IV-D are that participating states (1) provide a simple process for voluntarily acknowledging paternity [citation]; (2) require that voluntary acknowledgments may be rescinded only within the earlier of 60 days or the date of an administrative or judicial proceeding relating to the child in which the signatory is a party, including a proceeding to establish a support order [citation]; and (3) ensure that, after the [rescission] period, a

The Agency only cursorily addresses the equal protection issue. It submits that Frank's constitutional rights were not violated because "he was given the same opportunities as every other man to establish presumed father status in California. . . . Had he traveled to California and was denied access to the declaration process or properly executed a declaration but had not been recognized as a presumed father, then he would have an equal protection argument." The Agency ignores, however, that a voluntary paternity declaration must include the mother's signature and certain statements by the mother. (Fam. Code, § 7574, subd. (b)(1), (5).) The record contains no suggestion Jennifer would have cooperated with Frank in executing a voluntary paternity declaration in California several years after they ended their relationship, or that Frank had the financial ability to travel to California. The Agency's position essentially begs the constitutional questions.

*King, supra,* 3 Cal.3d 226, is instructive here. In *King,* the constitutionality of a former provision of Penal Code section 270 was at issue. It provided that a father who failed to provide for his child was guilty of a misdemeanor, but " '[i]f the father, during such violation, remains out of the state for 30 days . . . he is guilty of a felony.' " (*King,* at p. 230, fn. 1.) The court struck down the felony provision on equal protection grounds, explaining " '[d]iscrimination *solely* on the basis of location inside or outside of the state bears no more relation to the punitive and deterrent purposes of section 270 than differing locations of nonsupporting fathers within this state.' [Citation.] As odious as the offense of nonsupport of a child may be, it does not take on varying ethical coloration because of its geographic locale. Thus, when viewed in relation to the main purposes of the criminal nonsupport provision, the classification drawn appears arbitrary and irrational." (*Id.* at p. 233.)

Likewise, the disparate treatment here is based solely on geography, and location of a father inside or outside the state bears no more relation to the purposes of the presumed father statute than differing locations of fathers within California. The Agency has identified no compelling or even rational reason for the disparate treatment, and we are aware of none. Accordingly, we hold Family Code sections 7611 and 7570 et seq. violate constitutional equal protection principles to any extent they purport to deny Frank presumed father status on the sole ground he made his voluntary acknowledgement of paternity in Michigan instead of California.

---

voluntary acknowledgment may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof on the challenger [citation]." (*People ex rel. Public Aid v. Smith* (2004) 212 Ill.2d 389, 403 [289 Ill.Dec. 1, 818 N.E.2d 1204].) Both California and Michigan participate in the TANF program, (Temporary Assistance for Needy Families). (*Sneed v. Saenz, supra,* 120 Cal.App.4th at p. 1230; Welf. & Inst. Code, § 10080 et seq.; *Ghidotti v. Barber* (1998) 459 Mich. 189, 194–195 [586 N.W.2d 883]; Mich. Comp. Laws § 400.56i.)

## C

■ Frank also relies on the Constitution's full faith and credit clause. Article IV, section 1 of the United States Constitution requires that "[f]ull faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other State." "The purpose of the clause 'was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.' " (*Bank of America v. Jennett* (1999) 77 Cal.App.4th 104, 113 [91 Cal.Rptr.2d 359], citing *Milwaukee County v. White Co.* (1935) 296 U.S. 268, 277 [80 L.Ed. 220, 56 S.Ct. 229].) ■ "Regarding judgments, . . . the full faith and credit obligation is exacting. A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." (*Baker v. General Motors Corp.* (1998) 522 U.S. 222, 233 [139 L.Ed.2d 580, 118 S.Ct. 657].)

■ Frank's paternity affidavit is a public record of Michigan. (See Mich. Comp. Laws § 722.1005.) Further, under Michigan law, as California law, a voluntary acknowledgement of paternity has the same force and effect as a judgment of paternity. (Fam. Code, § 7573; Mich. Comp. Laws, § 722.1004.)

The Agency agrees the Michigan affidavit qualifies for full faith and credit, but it submits the juvenile court gave it due credit by declaring Frank a biological father entitled to reunification services only on a best interests showing under section 388. The Agency asserts that since there is no "presumed" father category in Michigan, the Michigan affidavit is not entitled to full faith and credit to establish presumed fatherhood in this state. The Agency points out there was no proceeding in Michigan in which Frank was adjudged entitled to reunification services, custody or visitation.

■ The full faith and credit clause "requires only that the judgment be given as much effect in the state of the forum as in the state of its rendition." (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 38, p. 121.) "It is well settled that both the validity and the effect of a judgment are governed by the laws of the state where it is rendered. . . . Judgments rendered in another state will usually be accepted as conclusive proof of the exact rights which have been finally adjudicated thereby. [Citation.] The full faith and credit provision of the Constitution is designed to provide a method of proving the record of a judicial proceeding in one state for the express purpose of carrying out the result of that proceeding in other states. [Citation.] The full faith and credit clause requires only that the judgment should

be given such effect as it had by the law or usage of the state of its origin." (*Gilmer v. Spitalny* (1948) 84 Cal.App.2d 39, 44 [189 P.2d 744].)

Frank agrees Michigan has no "presumed" father category, but he asserts the effect of a voluntary acknowledgment of paternity is nonetheless essentially the same in Michigan and California. In both states an acknowledgment acts as a judgment of paternity, and forms the basis for court-ordered custody, visitation and support. (Fam. Code, § 7573; Mich. Comp. Laws § 722.1004.) In California, a father who has signed a voluntary acknowledgment of paternity is, as a presumed father, ordinarily entitled to reunification services without any showing of best interests. (*Eric E., supra,* 137 Cal.App.4th at p. 259.) In Michigan, before the juvenile court enters a disposition order, the child welfare agency "shall prepare a case service plan [for the parents] that shall be available to the court and all the parties to the proceeding," and the court "shall consider the case service plan." (Mich. Comp. Laws, § 712A.18f, subds. (2), (4).)

The Agency ignores those provisions of the statute, and cites only the portion that states, "If services were not provided to the child and his or her parent . . . , the reasons why services were not provided" must be included in the agency's written report. (Mich. Comp. Laws, § 712A.18f, subd. (1)(b).) The Agency submits Michigan differs from California because Michigan "does not mandate treatment plans and services," and "if it is not safe or reasonable to reunite the family (i.e., the father sexually molested the child, beat the child, is incarcerated for a significant period . . . , etc.), it is not mandatory to give a treatment plan and services to that parent."

The Agency well knows, however, that in California there are also instances in which a parent, including a presumed father, may be denied services. For instance, services may be denied because of severe physical abuse or severe sexual abuse of the child or a sibling; because of the parent's history of drug or alcohol abuse and past resistance to court-ordered treatment; because the parent failed to reunify with other dependent children, as happened here with Jennifer; and because the parent is incarcerated and services would be detrimental to the child. (§ 361.5, subds. (b)(5), (6), (10), (13), (e)(1).) The Michigan statute, *read as a whole,* reasonably implies that a parent is entitled to reunification services unless there is a compelling reason for denying them (Mich. Comp. Laws, § 712A.18f), as is the case in California. We conclude the effect of the Michigan paternity affidavit is essentially the same under both Michigan and California law, and thus full faith and credit principles apply.

In any event, Family Code section 5604 puts the matter to rest. It provides: "A previous determination of paternity made by another state, whether established through *voluntary acknowledgment procedures* in effect in that state or through an administrative or judicial process shall be given *full faith and credit* by the courts in this state, and *shall have the same effect as a paternity determination made in this state* and may be enforced and satisfied in a like manner." (Italics added; see also 42 U.S.C. § 666(a)(11) [each state participating in the TANF program must design "[p]rocedures under which a State must give full faith and credit to a determination of paternity made by any other State, whether established through voluntary acknowledgment or through administrative or judicial processes"].)

■ At oral argument, the Agency asserted Family Code section 5604 is inapplicable because it appears in division 9, part 5, article 9 of the Family Code, which pertains to "intercounty support obligations." (Capitalization omitted.) We review issues of statutory construction independently, and "[o]ur primary aim in construing any law is to determine the legislative intent. [Citation.] In doing so we look first to the words of the statute, giving them their usual and ordinary meaning." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].) "Significance should be given, if possible, to every word of an act, and a construction that renders a word surplusage should be avoided." (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1602 [49 Cal.Rptr.2d 302].) " 'When the [statutory] language is clear and unambiguous, there is no need for construction.' " (*Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [11 Cal.Rptr.2d 222].)

■ Family Code section 5604 broadly states an out-of-state paternity declaration is entitled to full faith and credit and "shall have the *same effect* as a paternity determination made in this state." (Italics added.) ■ A voluntary paternity acknowledgment made in California has the *effect* of giving the father presumed father status. Had the Legislature intended to limit Family Code section 5604 to child support matters it could, of course, have said so. We conclude Family Code section 5604 is applicable, and regardless of the lack of a "presumed" father category in Michigan, that state's paternity acknowledgment is entitled to full faith and credit in California, meaning it qualifies Frank for presumed father status and reunification services as a matter of right.

## D

The Agency also contends the juvenile court was justified in requiring Frank to bring a section 388 motion and show the provision of reunification

services ·was in Mary's best interest because the reunification period had passed by. the time he· requested presumed father status based on the Michigan affidavit.

■■■ " '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' [Citation.] 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'The· burden thereafter is · on the parent to prove· changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' " (*In re Zacharia D., supra*, 6 Cal.4th at p. 447.) In addition to showing changed circumstances, the parent must make a prima facie showing that modification would serve the child's best interest. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, .806 [92 Cal.Rptr.2d 20].)

·The Agency relies on *Eric E., supra*, 137 Cal.App.4th 252, in which the biological father claimed entitlement to presumed father status based on his filing of a voluntary declaration in California. The court deemed his motion to have been brought under section 388 because it was made after expiration of the reunification period and the setting of a section 366.26 hearing. (*Eric E.*, at p. 258.) The court held the father's "argument that his voluntary declaration of paternity carries the weight of a judgment is premature because he cannot show that' he satisfies the threshold requirement of a section 388 petition." (*Id.* at p. 262.) The court rejected the notion it was improper to consider the best interest of the child in deciding presumed father status, as after the termination of reunification services and the scheduling of a hearing under section 366.26 the focus changed to the needs of the child. (*Eric E.*, at p. 262.)

*Eric E.*, however, is readily distinguishable. In *Eric E.*, the biological father was offered reunification services even though he was an· alleged father. He failed to ·comply with his case plan, and at the section 366.26 hearing, held more than a ·year after he was offered services, he moved for presumed father status· based on a voluntary declaration of paternity. (*Eric E., supra*, 137 Cal.App.4th at pp. 255–256.) In other words, the father was uncooperative and his lack of involvement during the reunification period showed a lack of dedication and the intent to unnecessarily delay the proceedings.

Here, in November 2005, at the commencement of the proceedings, Jennifer identified Frank as Mary's father and advised the court there was a paternity judgment and child support order in Michigan. On January 5, 2006, Jennifer was denied. reunification services, and thus there was never any reunification period. Frank first appeared and claimed presumed father status

on February 10, 2006, which appears to have been shortly after the Agency located him and notified him of the proceedings. It was also well within the 12-month reunification period for a child Mary's age. (§ 361.5, subd. (a)(1).)

*Eric E.* is inapplicable here, and the court erred by requiring Frank to bring a section 388 petition and make a best interest showing to receive reunification services. When Frank requested presumed father status in February 2006, the court should have granted it and ordered the Agency to provide him with a service plan. The error was prejudicial and requires reversal of the judgment terminating his parental rights and remand for further proceedings.

## II

### Jennifer's Appeal

#### A

Jennifer challenges the court's denial of her petition for modification under section 388 without an evidentiary hearing. "A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Zachary G., supra,* 77 Cal.App.4th 799 at p. 806.)

"However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G., supra,* 77 Cal.App.4th at p. 806.)

The appellate court " 'will not disturb [a] decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421 [159 Cal.Rptr. 460].)

We conclude Jennifer did not make a prima facie showing of changed circumstances. Jennifer conceded that when the jurisdiction and disposition hearing was held in early January 2006 she was not actively engaged in drug

rehabilitation. She argued circumstances had changed because in March she completed a detoxification program, and she was in drug treatment and attending NA meetings. Jennifer's drug abuse, however, dates back more than 23 years. She reported she began using illegal substances at the age of 13, and that contributed to her dropping out of school during the 10th grade. Her drugs of choice were marijuana, methamphetamine, cocaine and heroin. She lost custody of her three older children because of her drug abuse. Given the severity of Jennifer's drug problem the court could reasonably find her sobriety between March and the date of the hearing, June 20, was not particularly compelling. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [96 Cal.Rptr.2d 778] ["Carl's seven months of sobriety since his relapse . . . , while commendable, was nothing new"].)

Jennifer also claimed changed circumstances on the ground she was "seeking mental health treatment" that she did not receive during the dependency proceedings for her three older children. At the time of the hearing, however, she had been in dual treatment for drug abuse and bipolar disorder for only *four or five days.* As the court noted, there was no suggestion dual treatment may allow Jennifer to reunify with Mary within the 12-month period, which was then less than five months away. The court found "there is no way based on the . . . extensive history of this case that [Jennifer's] recent activity amounts to even a prima facie case of changing circumstances." We agree and find no abuse of discretion. "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] ' "[C]hildhood does not wait for the parent to become adequate." ' " (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47 [82 Cal.Rptr.2d 426].)

B

Additionally, Jennifer challenges the sufficiency of the evidence to support the court's finding that the exception to the adoption preference found in section 366.26, subdivision (c)(1)(A) is inapplicable. "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535].)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H., supra,* 27 Cal.App.3d at p. 573.) If the court finds a child cannot be returned to her parent and is likely to be adopted

if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination would be detrimental to the child under one of six specific exceptions. (§ 366.26, subd. (c)(1).) The section 366.26, subdivision (c)(1)(A) exception applies if "termination of parental rights would be detrimental to the child because '[t]he parents . . . have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.' " (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826 [86 Cal.Rptr.2d 739].) The parent bears the burden of proving the exception applies. (*Ibid.*)

 This court has interpreted the phrase "benefit from continuing the relationship" to refer to a "parent-child" relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

A parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W., supra,* 73 Cal.App.4th 823, 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from the day-to-day interaction, companionship and shared experiences." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)[5] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. (*In re Autumn H.,* at p. 575; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [60 Cal.Rptr.2d 557].)

It is undisputed that Jennifer regularly visited Mary. The record, however, contains substantial evidence to support the court's finding that Jennifer did not show Mary would suffer great harm if she did not have continued contact with her mother, or that the benefit of continued contact would outweigh the benefits of adoption.

The social worker wrote in the assessment report that she had observed four visits between Jennifer and Mary, and "[d]uring the visits Mary seems to

---

[5] However, as we clarified in *In re Casey D., supra,* 70 Cal.App.4th 38, 51: "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction."

enjoy the time she spends playing with [Jennifer]. However, Mary also leaves her mother's presence willingly and does not appear to be negatively impacted by her mother's absence. She does not ask to live with her nor does she ask when she will see her next. She has adapted to her current foster home. . . ."

In an addendum report, the social worker explained that during a recent visit Jennifer's "moods fluctuated from laughter to hostility" and she refused to follow the social worker's directions and spoke "about adult situations in front of her daughter." The report stated that "Mary consistently asks for her [maternal aunt] and to date has not asked the worker to see her mother." Jennifer had requested a bonding study and the court authorized one, but no such study was presented at the section 366.26 hearing. According to the social worker, "the exception of a beneficial parent child relationship does not exist in this case and terminating parental rights for Jennifer . . . would not be detrimental to Mary." Although there was also evidence that Jennifer and Mary had an affectionate relationship, the court's ruling is amply supported by the evidence.

## C

Jennifer also joins in Frank's arguments and contends that if we reverse the judgment terminating his parental rights, the judgment terminating her parental rights must be reversed as well, even absent any independent error pertaining to her.

California Rules of Court, rule 5.725(a)(2) provides in part, "The court may not terminate the rights of only one parent under section 366.26 unless that parent is the only surviving parent; or unless the rights of the other parent have been terminated . . . ; or unless the other parent has relinquished custody of the child to the welfare department." Rule 5.725(h) acknowledges the "purpose of termination of parental rights is to free the dependent child for adoption." We conclude that because the reinstatement of Frank's parental rights precludes Mary's adoption at this time, the reinstatement of Jennifer's parental rights is in Mary's best interest. We emphasize, however, that this does not affect the order terminating Jennifer's reunification services. (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110 [100 Cal.Rptr.2d 649] [discussing Cal. Rules of Court, former rule 1463, now rule 5.725].)

## III

### ICWA Notices

Additionally, both Jennifer and Frank persuasively contend the judgment must be reversed because of inadequate ICWA notices.

▇ "The ICWA provides that 'where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.' (25 U.S.C. § 1912(a).) If the tribe is unknown, the notice must be given to the Bureau of Indian Affairs [BIA] as the agent for the Secretary of the Interior. (*Ibid.*; 25 C.F.R. § 23.11 (2003); *In re Edward H.* (2002) 100 Cal.App.4th 1, 4 [122 Cal.Rptr.2d 242].) 'No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the . . . tribe [or] the [BIA].' (25 U.S.C. § 1912(a).)" (*In re Daniel M.* (2003) 110 Cal.App.4th 703, 707 [1 Cal.Rptr.3d 897]; see also Welf. & Inst. Code, §§ 224.2, subds. (a), (b), 224.3, subd. (a).)

▇ "Notice under the ICWA must, of course, contain enough information to constitute meaningful notice. The Guidelines for State Courts; Indian Child Custody Proceedings [citation] . . . , which are designed to implement the ICWA, require that the notice include, among other things, the name of the Indian child; his or her tribal affiliation; a copy of the dependency petition; the petitioner's name and address of the petitioner's attorney; and a statement of the right of the tribe to intervene in the proceeding." (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175 [6 Cal.Rptr.3d 205].) "Additionally, by federal regulation an ICWA notice must include, *if known*, (1) the name, birthplace, and birth date of the Indian child; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the child's parents, grandparents, great-grandparents and other identifying information; and (4) a copy of the dependency petition. [Citations.] '[T]o establish tribal identity, it is necessary to provide as much information as is known on the Indian child's direct lineal ancestors.' " (*Ibid.*)

▇ " 'To satisfy the notice provisions of the [ICWA] and to provide a proper record for the juvenile court and appellate courts, [a social service agency] should follow a two-step procedure. First, it should identify any possible tribal affiliations and send proper notice to those entities, return receipt requested. [Citation.] Second, [the agency] should provide to the juvenile court a copy of the notice sent and the return receipt, as well as any correspondence received from the Indian entity relevant to the minor's status.' " (*In re Asia L.* (2003) 107 Cal.App.4th 498, 507 [132 Cal.Rptr.2d 733].)

"Notice to the tribe shall be to the tribal chairperson, unless the tribe has designated another agent for service." (§ 224.2, subd. (a)(2).) The BIA (Bureau of Indian Affairs) "periodically publishes a current list of designated tribal agents for service of notice, along with the appropriate mailing addresses, in the Federal Register." (*In re H. A.* (2002) 103 Cal.App.4th 1206, 1213 [128 Cal.Rptr.2d 12].)

In her "Parental Notification of Indian Status" form, Jennifer checked the box that stated "I may have Indian ancestry." She did not list any tribe on the form. The Agency's jurisdiction and disposition report states the social worker contacted Jennifer's father and he said "his grandmother was 75% Cherokee and he 'thinks' that she was a registered member, however he is not certain. [He] provided all information needed to complete the JV-135" form. On November 28, 2005, the Agency sent notices by certified mail to the three Cherokee tribes, the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians, and the BIA. By mid-January 2006 each tribe had responded and advised that Mary was not eligible for enrollment. The Agency submitted copies of the responses to the court.

In his paternity questionnaire, Frank stated he had American Indian heritage and gave the name of the Kumeyaay tribe. His counsel reported that Frank told him "he has family that are members in the Kumeyaay tribe and, in particular, the Campo Band." The Agency sent notice to the Kumeyaay tribe, and because it had information on the father it also renoticed the three Cherokee tribes and the BIA. In a report filed April 19, 2006, the Agency advised the ICWA does not apply, and "[a]ttached are the return receipts as well as a response from the tribes."

The record contains copies of the responses to the second set of notices to the United Keetoowah Band of Cherokee Indians and the Cherokee Nation. The record does not, however, contain a copy of any response from the second notice to the Eastern Band of Cherokee Indians. Further, it is undisputed that the Agency sent the ICWA notice to the Kumeyaay tribe at the wrong address. The record contains no response from the Kumeyaay tribe and is devoid of any other evidence the tribe received actual notice.

Citing *In re Karla C., supra,* 113 Cal.App.4th at page 178, the Agency concedes the "majority view under current California case law holds that proof of notice must be provided to the court, including copies of the actual notices sent, the receipts for mailing, and any responses." The Agency contends, however, that the missing response from the Eastern Band of Cherokee Indians does not warrant reversal because section 224.2, subdivision (c) provides that "[p]roof of the notice, including copies of

notices sent and all return receipts and responses *received*, shall be filed with the court . . . ." (Italics added.) The agency points out that it may not receive responses from all noticed tribes, and that is a matter out of its control.

The Agency ignores, however, that it filed a report with the court that indicated it *had* received responses from the second notices sent to each of the three Cherokee tribes as well as from the Kumeyaay tribe. If the agency did not receive a response from the Eastern Band of Cherokee Indians it is required to advise the court. If it did receive a response, it is required to submit a copy of it to the court.

Further, the Agency concedes it sent notice to the Kumeyaay tribe at the wrong address "as the current address in the Federal Register was not used." Sending an ICWA notice to the wrong address is error, and the error is prejudicial when, as here, the record lacks conclusive evidence the tribe received actual notice. (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 783 [53 Cal.Rptr.3d 251]; *In re H. A., supra,* 103 Cal.App.4th at p. 1213.)

The Agency claims that under the rationale of *In re Rebecca R.* (2006) 143 Cal.App.4th 1426 [49 Cal.Rptr.3d 951], the parents cannot show prejudicial error because *on appeal* they have not presented any evidence that Mary is actually a member of an Indian tribe or eligible for membership. In *In re Rebecca R.,* the father contended the ICWA was violated because even though the court ordered the social services agency to ask him whether he had Indian ancestry, the record contained no documentation to show it did so. The court rejected the contention because the provisions of a rule of court the father relied on were not in effect at the relevant time, and the record contained substantial evidence that the social services agency complied with the court's direction since its reports stated the ICWA was inapplicable and a presumption arose under Evidence Code section 664 that it carried out its duty. (*In re Rebecca R.,* at pp. 1429–1430.)

The court also rejected the father's claim because "there can be no prejudice unless, *if* he had been asked, father *would have* indicated that the child did (or may) have such ancestry." (*In re Rebecca R., supra,* 143 Cal.App.4th at p. 1431.) The court explained: "Father is here, now, before this court. There is nothing whatever which prevented him, in his briefing or otherwise, from removing any doubt or speculation. He should have made an offer of proof or other affirmative representation that, had he been asked, he would have been able to proffer some Indian connection sufficient to invoke the ICWA. He did not. [¶] In the absence of such a representation, the matter amounts to nothing more than trifling with the courts. [Citation.] The

knowledge of any Indian connection is a matter wholly within the appealing parent's knowledge and disclosure is a matter entirely within the parent's present control." (*Ibid.*)

This case is distinguishable from *In re Rebecca R.*, because the record here shows the parents did disclose Indian ancestry to the Agency. *In re Rebecca R.* does not hold that on appeal a parent must produce evidence—as a prerequisite to reversal for ICWA notice deficiencies—that the child is a member of an Indian tribe or eligible for membership in a tribe. Indeed, a parent does not have to make that showing at the juvenile court to trigger the ICWA notice provisions. Rather, that is a determination the noticed tribes make. (§ 224.3, subd. (e)(1).) "Congress was not only concerned about the interests of individual members of a tribe but of the tribe itself. [Citations.] The [ICWA] clearly protects the right of the tribe independent from any rights held by either parent." (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1425 [285 Cal.Rptr. 507].) Further, "parents are not necessarily knowledgeable about tribal government or membership and their interests may diverge from those of the tribe . . . ." (*Ibid.*)

Moreover, appellate courts rarely accept postjudgment evidence. "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .' [Citation.] The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal." (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].) In our view, making the appellate court the trier of fact is not the solution. "[I]t is up to the juvenile court to review the information concerning the notice given, the timing of the notice, and the response of the tribe, so that it may make a determination as to the applicability of the ICWA." (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 705 [127 Cal.Rptr.2d 54].)

We conclude the ICWA notice defects here constitute reversible error.[6]

---

[6] When reversal of a judgment is required solely to rectify ICWA notice requirements, we issue a limited reversal. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 705–706 [43 Cal.Rptr.3d 171].) A limited reversal serves no purpose here as we also reverse the judgment for reasons unrelated to the ICWA.

## DISPOSITION

The judgment terminating parental rights is reversed. The case is remanded to the juvenile court with directions to order that Frank is a presumed father entitled to reunification services, and to order the agency to comply with the notice provisions of the ICWA.

Huffman, J., and McIntyre, J., concurred.